**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| JACOB B. and AMELIA M. by their next friend Ramona Fernandez; JOSEPH S. by his next friend Charles Cusimano; ALAN W. and JACKSON J. by their next friend Hector Linares; CARTER P. and MIKAELA S. by their next friend Steven Scheckman; JUSTINE S. by her next friend Bert Babington; KATRINA R. by her next friend Claris Smith, individually and on behalf of all others similarly situated, | CIVIL ACTION NO.: _____<br><br>SECTION:<br><br>JUDGE:<br><br>MAGISTRATE: |
|        Plaintiffs, | |
|   v. | |
| LOUISIANA DEPARTMENT OF CHILDREN AND FAMILY SERVICES, DAVID N. MATLOCK in his official capacity as the Secretary of the Louisiana Department of Children and Family Services, and JEFFREY LANDRY in his official capacity as the Governor of Louisiana, | |
|        Defendants. | |

---

## CLASS ACTION COMPLAINT

---

## INTRODUCTION

1.    Recently, on February 19, 2024, the Secretary of the Louisiana Department of Children and Family Services ("DCFS"), David Matlock, told WRKF *Talk Louisiana* that his agency was in a "death spiral"—it is "hemorrhaging" employees, "caseloads are way too high," and caseworkers who "should have a caseload of 10 . . . got a caseload of 60 or 100."[1] He added:

---

[1] *Talk Louisiana with Jim Enster, David Matlock, Marylee Orr, Molly Ryan*, at 10:05 a.m. (Feb. 19, 2024), https://www.wrkf.org/show/talk-louisiana/2024-02-19/david-matlock-marylee-orr-molly-ryan.

"I need to hire 300 employees," "I need a fleet of vehicles," and "our caseloads are completely out of hand."

2.    These problems are not new. More than two years ago, in March 2022, then-DCFS Secretary Marketa Garner Walters raised the same concerns. She testified to the Louisiana Legislature that DCFS was "drowning" and has "never had enough staff in child welfare since [she's] been here."[2] She explained: "We've got 400 empty chairs"—in other words, her agency had *four hundred* positions that it needed to fill.  When asked why DCFS couldn't fill the positions, she said: "[I]t's salary, it's workload, it's COVID, it's the Great Resignation, it is the work itself."

3.    Three months after former Secretary Walters' testimony, two-year-old Mitchell Robinson III died from a fentanyl overdose in Baton Rouge. Before Mitchell's death, DCFS had received three reports from his healthcare providers, warning that he had been hospitalized from overdosing on fentanyl and asking DCFS to intervene. Caseworkers never made contact with the family or made any effort to remove him from their care. Mitchell died approximately a week after the final warning to DCFS.

4.    Just sixteen days after Mitchell's death, the remains of two-year-old Ezekiel Harry were found in a trash can in Terrebonne Parish. The coroner determined that he died from blunt force trauma to the head as a result of abuse by his mother and her boyfriend. Before his death, DCFS received, but did not act on, several reports from a neighbor worried about the screams she kept hearing from Ezekiel and his siblings.

---

[2] Annie Johnson, *Months Before Recent Failures at DCFS, Leaders Sounded Alarm Over Staffing Problems*, WBRZ 2 (Aug. 6, 2022), https://www.wbrz.com/news/months-before-recent-failures-at-dcfs-leaders-sounded-alarm-over-staffing-problems/.

5. In response to these high profile deaths, then-Secretary Walters told the Louisiana Legislature that DCFS's caseworkers had been pushed "beyond their capacity" and still had "around 400 open positions while reports of abuse and neglect across the state are increasing."[3] She said: "There aren't enough hands on the plow."[4]

6. Media outlets also blamed DCFS's failures on "[s]evere, chronic staffing shortages."[5] They noted that caseloads at DCFS "are three times higher than the national standard," with some caseworkers reporting caseloads of "more than 100 cases." A former DCFS employee noted in their resignation letter: "When a worker has 100 cases, that's a fatality waiting to happen."[6]

7. Louisiana has consistently failed to adequately address the myriad deficiencies of its child welfare system. DCFS does not have a sufficient number of workers to ensure the safety and wellbeing of the children in its care. Upon information and belief, caseloads are so high that caseworkers are prevented from adequately overseeing children in DCFS custody, including making required visits, ensuring the provision of services, and ensuring children move quickly to permanency.

---

[3] Andrea Gallo, *In Louisiana's Child Welfare System, Senate Testimony Reveals 'Every Day Is Excruciating'*, The Advocate (Sept. 6, 2022), https://www.theadvocate.com/baton_rouge/news/in-louisianas-child-welfare-system-senate-testimony-reveals-every-day-is-excruciating/article_0e3f5172-2a30-11ed-949c-9fd4763bf907.html.

[4] Wesley Muller, *Louisiana Legislators Seek Solutions to Overburdened Child Welfare System*, Louisiana Illuminator (Sept. 6, 2022, 7:14 PM), https://lailluminator.com/2022/09/06/louisiana-legislators-seek-solutions-to-overburdened-child-welfare-system/.

[5] Andrea Gallo, *Huge Caseloads, High Stakes: The Dire Situation Louisiana's Child Welfare Workers Face*, The New Orleans Advocate (Sept. 25, 2022), https://www.nola.com/news/huge-caseloads-high-stakes-the-dire-situation-louisiana-s-child-welfare-workers-face/article_0b9472c4-39bf-11ed-bc86-6bbfcc29fcae.html.

[6] Alena Noakes, *Former DCFS Workers Detail Years-Long Issues Within Cenla Offices*, KALB (Sept. 19, 2022, 4:29 PM), https://www.kalb.com/2022/09/13/former-dcfs-workers-detail-years-long-issues-within-cenla-offices/.

8.      According to DCFS's 2024 Annual Progress and Services Report, in its most recent reporting period, Louisiana received its lowest rate of achieving permanency and stability in children's living situations since the 2019-2020 reporting period.[7] Further, DCFS acknowledged that Louisiana "is performing below national [standards]."

9.      These failures also mean that Louisiana's foster children are not provided appropriate mental health or medical assessments, nor do they receive adequate mental or medical healthcare. DCFS also fails to provide sufficient educational services. As demonstrated by the experiences of the named Plaintiffs, Louisiana foster children often spend weeks, if not months, without receiving any education. This only compounds the difficulties that these already traumatized children face while in DCFS custody.

10.     Placement instability also plagues the DCFS system. While research shows that stability is crucial for foster children—for their education, wellbeing, and health—DCFS consistently moves children across placements. DCFS acknowledges that it has historically fallen below the national standard in placement stability. Foster care placements are often disrupted due to DCFS's failure to provide enough support to the child or foster parents. Additionally, DCFS also fails to support and properly fund foster homes, resulting in countless closures each year. Indeed, Secretary Matlock recently admitted that "we need foster parents. We need better communication with foster parents. We need engagement of foster parents."[8]

11.     DCFS's own documents reflect that placement instability is a significant issue in Louisiana. In 2021, nearly a fifth of children in the Louisiana foster care system had three or more

---

[7] La. Dep't of Children & Family Servs., *2024 Annual Progress and Services Report* at 64.
[8] *Talk Louisiana with Jim Enster, David Matlock, Marylee Orr, Molly Ryan*, at 10:05 a.m. (Feb. 19, 2024), https://www.wrkf.org/show/talk-louisiana/2024-02-19/david-matlock-marylee-orr-molly-ryan.

placements within their first twelve months in foster care. This trend continues. According to DCFS's 2024 Annual Progress and Services Report, 30% of Louisiana foster children are moved to a new placement within 10 days and 40% within 30 days—statistics that are worse than national averages.[9]

12.    When placements disrupt, DCFS often places children in whichever placements are available, regardless of the child's needs or desires. Some children are shipped out of state, thousands of miles from their homes and communities. Others are placed in overly-restrictive settings or in facilities that do not meet their basic needs—often because they have nowhere else to go.

13.    Even worse, DCFS lacks a sufficient number of adequate placements. As a result, DCFS often places children in hotels, hospitals, and DCFS offices. While these are intended to be short-term solutions, these "placements" often end up lasting several months. A January 2024 article reported that since March 2023, 150 foster children had 1,876 hotel stays.[10]

14.    DCFS also often unnecessarily places children in group homes and institutions. There, children face harm or a risk of harm, including violence perpetrated by staff members and other children. Named Plaintiff Jacob B., for example, was sexually assaulted during his placement at a behavioral health hospital in Louisiana. Despite knowing of the assault, DCFS did not remove Jacob from that facility for around seven more months. Additionally, Jacob received no schooling for the nine months he resided at that facility. Named Plaintiff Mikaela S. has been in 27

---

[9] La. Dep't of Children & Family Servs., *2024 Annual Progress and Services Report* at 64.
[10] Scottie Hunter, *I-Team: DCFS Brings Facility Online to Prevent Housing Kids in Hotels*, WAFB (Jan. 4, 2024, 5:25 PM), https://www.wafb.com/2024/01/04/i-team-dcfs-brings-facility-online-prevent-housing-kids-hotels/.

placements since entering foster care in October 2020—almost all of which have been institutions or group homes. She has not received any schooling for almost the last two years.

15.    As the named Plaintiffs' experiences exemplify, DCFS often places children in institutions that are more restrictive than necessary. This usually occurs because less-restrictive placements are not available or because the services these children need are not available in less-restrictive settings. For example, DCFS placed named Plaintiff Jackson J. at Cypress Grove Behavioral Health for over two months. But Cypress Grove is a short-term acute psychiatric facility, and the Cypress Grove doctors said that Jackson was ready for discharge just four days after arriving. Similarly, named Plaintiff Alan W. was placed at Cypress Grove for five months. Named Plaintiff Joseph S. was institutionalized at New Way of Southwest, a psychiatric facility, for almost ten months—not because he needed to be there for that long, but because less-restrictive placements were not available. Named Plaintiff Mikaela S. was placed at Northlake Behavioral Health System hospital, and when DCFS was asked why it had placed her there, it had no response. Additionally, DCFS institutionalized named Plaintiff Amelia M. at Pinecrest Support and Services Center after they could not ensure that her medical needs were met in community-based settings. Amelia M. has remained at this overly-restrictive institution for more than a year.

16.    DCFS has also made insufficient efforts to find these children permanent homes. Placement instability, due in part to DCFS's inadequate placement array, compounds trauma for children who have already faced abuse and neglect or removals from their homes.

17.    In addition, many of the placements available to children in DCFS custody are inadequate. Placement homes are poorly screened, and DCFS fails to timely provide the support services necessary to help families care for traumatized children. As shown by the named

Plaintiffs' cases, DCFS also has an inadequate array of necessary and specialized residential treatment programs for the children who cannot be cared for in a foster family setting. On information and belief, the State often uses psychotropic medications in a haphazard manner, as a form of chemical constraint to control children's behavior, rather than for the limited uses for which psychotropic medications are acceptable. Case planning is often non-existent, or simply rote, because high caseloads make individualized planning for children in need of services a rarity.

18.    DCFS has been aware of these issues for nearly a decade since then-Governor Bobby Jindal cut the agency's workforce by a third and its budget by a half between 2008 and 2016. A 2016 DCFS transition report prepared for then-Governor John Bel Edwards stated that "the populations most in need are underserved" and "child safety is at risk."[11] Even with this warning, DCFS failed to implement any meaningful changes and continued to harm children in its custody. In February 2024, Secretary Matlock stated that DCFS "has been eviscerated by funding cuts that have profoundly affected the agency's ability to handle child welfare cases," showing that DCFS has failed to improve the dire conditions it has known about for almost a decade.[12] DCFS continues to fail the children it is meant to protect and has not made meaningful improvements to the system it oversees.

19.    By failing to act, DCFS and its officials violated and continue to violate their statutory and constitutional obligations. Moreover, despite the dysfunction of the state's child welfare system, state officials continue to operate it without regard for reasonable professional

---

[11] Comm. on Children & Family Servs. Members, Onward Louisiana, Transition Committee on Children and Family Services 9, 13 (Jan. 21, 2016), https://www.gov.louisiana.gov/assets/docs/TransitionTeam/DCFS_Transition_Final_ Report.pdf.
[12] Andrea Gallo, *Louisiana's Child Welfare Agency Remains in a 'Downward Spiral.' Can New Leader Turn It Around?*, NOLA.COM (Feb. 23, 2024), https://www.nola.com/news/louisiana-keeps-losing-child-welfare-workers-in-droves/article_a2174f14-8c94-5217-ae6e-3111460d8d0b.html#tncms-source=featured-top.

standards. This exhibits deliberate indifference to the ongoing harm faced by children who depend on the state for protection and care.

20.     Plaintiffs therefore seek declaratory and injunctive relief against Defendants to remedy the harm and risk of harm to thousands of foster children in Louisiana. This lawsuit seeks to have Louisiana's child welfare system brought into compliance with applicable federal law and constitutional standards.

## JURISDICTION AND VENUE

21.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343(a), as well as under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. § 670 *et seq.*, as amended by the Adoption and Safe Families Act of 1997, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

22.     This Court has jurisdiction to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

23.     Venue in this district is proper under 28 U.S.C. § 1391(b) because the claims arise in this district. Although Defendants are responsible for children all over the state, they operate their administrative and managerial functions out of their headquarters in Baton Rouge.

**PARTIES**

## I.       NAMED PLAINTIFFS

### A.       Jacob B.[13]

24.      Jacob is sixteen years old and has been in DCFS custody since August 2022.  He currently resides at A-1 Absolute Best Care, a psychiatric residential treatment facility in Gretna, Louisiana. Jacob is a member of the General Class and ADA Subclass.

25.      Jacob appears through his next friend, Professor Ramona Fernandez. Professor Fernandez is the Deputy Director of the Loyola Law Clinic and a Clinic Professor. She has extensive experience representing individuals in the areas of family law, criminal law, and juvenile law. She is dedicated to the best interests of Jacob B.

### B.       Amelia M.

26.      Amelia is seventeen years old and has been in DCFS custody since February 2021. She currently resides at Pinecrest Supports and Services Center, an intermediate care facility, in Pineville, Louisiana. Amelia is a member of the General Class and ADA Subclass.

27.      Amelia appears through her next friend, Professor Ramona Fernandez. Professor Fernandez is dedicated to the best interests of Amelia M.

### C.       Joseph S.

28.      Joseph S. is twelve years old and has been in DCFS custody since June 2022. He currently resides at Nexus Children's Hospital in Houston, Texas. Joseph is a member of the General Class and ADA Subclass.

---

[20.] The names of the children have been changed to pseudonyms to allow the children to remain anonymous.

29.     Joseph appears through his next friend, Charles Cusimano. Mr. Cusimano is a retired attorney and has experience in the areas of family law and adoptions. He became a court appointed special advocate ("CASA") in 2020 and works with foster children in the Capital Area. Mr. Cusimano is dedicated to the best interests of Joseph S.

**D.     Alan W.**

30.     Alan W. is eleven years old and has been in DCFS custody since January 2023. He currently resides at the Louisiana Methodist Children's Home. Alan is a member of the General Class and ADA Subclass.

31.     Alan appears through his next friend, Professor Hector Linares. Professor Linares teaches the Youth Justice section of the Law Clinic at Loyola University of New Orleans College of Law, is co-director of The Gault Center's southern regional center, and is a certified Youth Defense Advocacy Program trainer. Professor Linares is dedicated to the best interests of Alan W.

**E.     Carter P.**

32.     Carter P. is fourteen years old and has been in DCFS custody since October 2012. He currently resides at Nexus Children's Hospital in Houston, Texas. He is a member of the General Class and ADA Subclass.

33.     Carter appears through his next friend, Steven Scheckman. Mr. Scheckman was an Adjunct Professor of Law at Tulane University's Law School, a founding member and former Vice President of CASA New Orleans, and a participating member of the Louisiana State Law Institute Children's Code Revision Committee and the Advisory Committee of the Children's Code Project. Mr. Scheckman is dedicated to the best interests of Carter P.

**F.    Jackson J.**

34.    Jackson is sixteen years old and has been in DCFS custody since at least December 2022. He is currently on runaway status. Jackson is a member of the General Class and ADA Subclass.

35.    Jackson appears through his next friend, Professor Hector Linares. Professor Linares' background has been previously described herein, and he is dedicated to the best interests of Jackson J.

**G.    Justine S.**

36.    Justine is twelve years old and has been in DCFS custody since January 2022. She currently resides with her biological mother but remains in DCFS custody. Justine is a member of the General Class.

37.    Justine appears through her next friend, Bert Babington. Mr. Babington is an attorney and a member of the Children's Code Committee of the Louisiana State Law Institute. Mr. Babington worked as a CASA from 2002-2006 and worked with children in Caddo and Bossier Parishes. In 2005, Mr. Babington first became a licensed foster parent. He is dedicated to the best interests of Justine S.

**H.    Katrina R.**

38.    Katrina is seven years old and has been in DCFS custody since March 2015. She currently resides in a foster home. Katrina is a member of the General Class.

39.    Katrina appears through her next friend, Claris Smith. Ms. Smith is an attorney and Katrina's former foster mother. She has known Katrina since April 2022. Ms. Smith cared for Katrina for approximately 21 months and she and Katrina developed a strong bond. Ms. Smith is

deeply invested in Katrina's wellbeing, is familiar with her background and needs, and is dedicated to her best interest.

### I.    Mikaela S.

40.    Mikaela is sixteen years old and has been in DCFS custody since October 2020. She currently resides at Holistic Haven, a psychiatric residential treatment facility in Bogalusa, Louisiana. Mikaela is a member of the General Class and ADA Subclass.

41.    Mikaela appears through her next friend, Steven Scheckman. Mr. Scheckman's background and qualifications have been previously described herein, and he is dedicated to the best interests of Mikaela S.

## II.    DEFENDANTS

42.    Defendant DCFS is a state agency created and authorized under the laws of Louisiana. Louisiana has delegated to DCFS the responsibility for developing and providing social services and for improving social conditions for the citizens of Louisiana.[14] When a child enters DCFS custody, the child is "assigned to the custody of the department rather than to a particular placement setting," and DCFS has "authority over the placement within its resources and the allocation of other available resources within the department."[15]

43.    Defendant David Matlock is the Secretary of DCFS and is sued solely in his official capacity. Under Louisiana law, Mr. Matlock is appointed by the governor and is responsible for the control and operation of DCFS.[16] Mr. Matlock is authorized to create and implement policies

---

[14] La. Rev. Stat. § 36:471.
[15] La. Ch. C. Art. 672(A)(1).
[16] La. Rev. Stat. § 36:473.

of DCFS, and to employ and remove personnel.[17] Mr. Matlock is responsible for DCFS policies, practices, operations, and compliance with all applicable federal and state laws.

44.     Defendant Jeffrey Landry is the Governor of Louisiana and is sued solely in his official capacity. The Executive Reorganization Act – Title 36 – was specifically enacted for the electorate to hold the governor accountable for the manner in which the agencies under the executive branch function and deliver services to the people.[18] The reorganization consolidated approximately 300 independent agencies into 20 departments (including DCFS) under the offices of the governor and the lieutenant governor. DCFS is one of the "cabinet departments" of the Governor's office, which is under the direct control of the Governor but at the direction of a secretary, who is the executive head and chief administrative officer of that department.[19]

## FACTUAL ALLEGATIONS

### III.     THE PLAINTIFF CHILDREN

45.      The following named Plaintiffs' experiences illustrate how DCFS violates its legal obligations and exposes Louisiana's foster children to a substantial risk of harm while in DCFS's custody.

#### A.     Jacob B.

46.     Jacob B. is sixteen years old and currently resides at A-1 Absolute Best Care, a psychiatric residential treatment facility in Gretna, Louisiana. Jacob entered DCFS custody in August 2022 and has experienced five placement moves in just the last year—all of which have been institutional placements that lack any family-like structure or support. Jacob has received

---

[17] La. Rev. Stat. § 36:474.
[18] *See* La. Stat. Ann. § 36:4; Organization of State Government, The Executive Branch, pg. 1C-2, https://house.louisiana.gov/slg/PDF/Chapter%201%20Part%20C%20-%20The%20Executive%20Branch.pdf.
[19] La. Stat. Ann. § 36:4; Organization of State Government, The Executive Branch, pg. IC-9.

varying and sometimes inconsistent diagnoses at each facility, including bipolar disorder, ADHD, schizophrenia, diabetes, and impulse disorder. He also has been diagnosed with other moderate to severe intellectual disabilities. He has been prescribed various psychotropic medications.

47.     Jacob's biological parents died when he was a newborn. His father was murdered, and his mother passed away soon after giving birth to him. Jacob went to live with his aunt when he was about six days old. Jacob's aunt eventually adopted him, and he lived with her until he was approximately fifteen years old.

48.     After Jacob demonstrated self-harming and defiant behaviors, his aunt decided she could no longer adequately care for him. He was placed in DCFS custody in August 2022.

49.     Upon leaving the only parent he had ever known, Jacob was initially placed at a psychiatric inpatient facility for adults and children in Shreveport, Louisiana, where he stayed for almost a month. DCFS did not provide schooling to Jacob while he was there. Instead, Jacob was placed in a room without windows and that he was not permitted to leave due to his behavior.

50.     Pursuant to a physician's emergency certificate, on or about September 29, 2022, DCFS moved Jacob to Louisiana Methodist Children's Home, a psychiatric residential treatment facility in Ruston, Louisiana. He remained at that facility until November 9, 2022. Jacob was diagnosed with diabetes while there, but DCFS never sent him to a specialist for diagnosis, care, or treatment.

51.     During this time, Jacob was reportedly aggressive with staff members, displayed self-injurious behaviors, and tried to run away. As a result, DCFS sent Jacob to Ochsner LSU Health on November 9, 2022, where he was placed on a 72-hour hold.

52.     Upon leaving Ochsner, Jacob was sent to another psychiatric facility, where he remained until early August 2023. The facility is a short-term acute inpatient psychiatric treatment facility where patients are meant to stay for only a few days. Despite knowing this, DCFS allowed Jacob to remain there for approximately nine months, during which time he did not receive any educational services. Instead, he was often placed on "room restriction," during which he had to remain in his room all day without any medical treatment, education, or human interaction.

53.     In January 2023, Jacob reported that he was sexually assaulted by another patient. Due to its failure to communicate with Jacob's healthcare providers or review his care plan, DCFS did not learn of Jacob's sexual assault for nearly four months, when a DCFS caseworker eventually noticed that Jacob was being treated for a sexually transmitted infection. Despite learning that he had been assaulted, DCFS allowed Jacob to remain at that facility for another seven months. During that time, DCFS did not ensure that Jacob was properly treated for the infection.

54.     Finally, in August 2023, Jacob was transferred to another inpatient psychiatric hospital, where he again did not attend school or receive any educational services. Additionally, while there, DCFS did not ensure that Jacob took his antibiotics for the sexually transmitted infection. Jacob was also reportedly found not to be diabetic, indicating that either the prior diagnosis or the current one was not medically informed.

55.     DCFS eventually transferred Jacob to an intermediate care facility in New Orleans called A-1 Absolute Best Care. A-1 houses adults, and Jacob is the only resident under eighteen.

56.     Jacob lost one year's worth of education due to placement disruptions and having been inappropriately placed in hospital settings for long periods of time. There is no indication that DCFS tried to get Jacob into school during that one-year period or to otherwise plan for his

education. DCFS's failure to do so and utter lack of concern for Jacob's right to, and need for, education demonstrates deliberate indifference to Jacob's wellbeing. This will have catastrophic effects on his life moving forward.

57.    Additionally, each time DCFS transfers Jacob to a new placement, he is seemingly diagnosed with new and different conditions and is prescribed inconsistent psychotropic and non-psychotropic medications. DCFS has demonstrated deliberate indifference to Jacob's medical and mental health needs and has failed to effectively create or enforce any policy or practice that guarantees that Jacob's diagnoses and treatment regimens are accurate and consistent.

58.    DCFS's actions and inactions have severely hampered Jacob's ability to support himself and to develop the life and social skills needed to survive once he leaves DCFS custody.

59.    Although Jacob's permanency plan goal has been "freed for adoption" since entering care in 2022, DCFS has made no efforts to find an adoptive home for him and has instead placed him in only institutional settings and group homes where adoption is not a realistic possibility.

60.    As a direct result of Defendants' actions and inactions, Jacob has suffered and continues to suffer severe emotional and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate medical treatment, engaged in reasonable case planning and placement matching, not disregarded professional standards as to the management of Jacob's case, and not acted with deliberate indifference to the circumstances creating a substantial risk of serious harm, Defendants may have prevented Jacob's condition from deteriorating while in state custody and could have prevented many of the harms that have ultimately befallen him. Without relief, Jacob will continue to suffer from placement instability,

lack of appropriate services, delayed permanency, severe emotional and psychological harm, and a risk of serious psychological, emotional, and physical harm.

**B.    Amelia M.**

61.    Amelia M.  is seventeen years old and suffered significant trauma at a young age. Her biological mother abused substances throughout her pregnancy and while breastfeeding Amelia, leading DCFS to remove Amelia from her mother's care when she was just two years old.

62.    Amelia was born with Phenylketonuria, also known as PKU, which is a medical disorder that increases the level of phenylalanine, a protein building block, in her blood. Because of this disorder, Amelia's protein levels need to be regularly monitored and she must maintain a specific diet. If her PKU is not properly treated, Amelia's phenylalanine levels can increase— which, in turn, can cause permanent intellectual disabilities, seizures, behavioral problems, and psychiatric disorders. Since being diagnosed with PKU, Amelia has been monitored by the Children's Hospital in New Orleans.

63.    In her first year in DCFS custody, DCFS cycled Amelia through twelve different foster care homes—all before she turned three years old. Amelia's biological brother was also taken into DCFS custody, but DCFS has never placed the siblings together.

64.    At the age of three, Amelia was placed with a foster parent, Ms. R, who adopted Amelia when she was five. By that time, she had suffered brain damage and exhibited hyperactivity caused by DCFS's and her prior caregivers' failures to ensure that she maintained a PKU-compliant diet.

65.     On February 10, 2021, DCFS again took Amelia into custody, placing her with an aunt and uncle. That placement did not last long: Amelia's aunt and uncle were only able to care for her for a few months.

66.     On April 16, 2021, DCFS transferred Amelia to an inpatient psychiatric hospital for adults and children, where she stayed until July 2, 2021. While there, DCFS did not provide Amelia any schooling.

67.     On July 2, 2021, DCFS transferred Amelia back to Ms. R.'s home. That placement was quickly disrupted, however, because Ms. R. failed to ensure that Amelia was maintaining a PKU-complaint diet.

68.     Since September 2022, DCFS has placed Amelia in three additional placements.

69.     In September 2022, Amelia was placed in a home supported by L&D Community Care. DCFS next placed her at Northlake Behavioral Health hospital in Mandeville, Louisiana. But Northlake lost its accreditation in 2022, allegedly because "the facility did not 'minimize the possibility of transmitting infections,' keep proper records of patient care, conduct fire drills or manage fire risk, safely store medication, provide 'resuscitation services' throughout the hospital, or 'reduce the risk for suicide.'"[20] According to the *Times-Picayune*, federal inspections revealed that conditions at Northlake "are so dire that patients' lives can be placed at risk" and conditions continue to deteriorate each year. Despite knowing this, DCFS continue to place children at Northlake, perhaps due to "a lack of in-patient psychiatric beds, particularly for adolescents" in the New Orleans metro area. The *Times-Picayune* explained that "[p]atient advocates and former

---

[20] Alex Lubbe, *Federal Reports Describe Dire Conditions at Psychiatric Hospital in Mandeville*, NOLA.COM (Dec. 15, 2023), https://www.nola.com/news/northshore/federal-reports-show-dire-conditions-at-mandeville-hospital-northlake/article_c8a183a8-9b6f-11ee-a7a2-5774035c855f.html.

Northlake staffers suspect the state might be incentivized to keep Northlake running because the beds are so sorely needed — even if the [Louisiana Department of Health] understands the facility is not meeting accepted standards of care."

70.    Additionally, children like Amelia who are placed at Northlake are at further risk of harm due to the staffing crisis in that facility. A March 30, 2023, report from the federal Centers for Medicare and Medicaid Services "identified a condition of 'immediate jeopardy'—a federal red-alert status in which the hospital 'has placed the health and safety of recipients in its care at risk for serious injury, serious harm, serious impairment or death,' according to CMS regulations—because Northlake didn't have enough trained staff on site." In addition to a staffing shortage, staff are unqualified to care for patients. At the time of the March 30 report, more than half of the 201 employees involved in patient care were not certified in CPR.

71.    After Northlake, Amelia was transferred to Pinecrest Support and Services Center, an intermediate care facility[21] in Pineville, Louisiana, on February 2, 2023. Amelia remains in Pinecrest to this day. Pinecrest is an institution that houses approximately 1,200 developmentally disabled children and adults.

72.    Upon information and belief, Amelia did not receive any schooling at L&D Homecare or Northlake, nor has she received consistent schooling at Pinecrest. Although Pinecrest has a public school, in the 2020-21 school year, 90% of students scored below the proficient level

---

[21] An intermediate care facility is one that "provides services to individuals that require 24 hours of Active Treatment in community, group, or residential home settings" and is "licensed to provide residential care for four or more individuals that meet the criteria for 24 hours per day of Active Treatment." LA. DEP'T OF HEALTH, *Health Standards*, https://ldh.la.gov/page/intermediate-care-facility-for-the-developmentally-disabled-icfdd (last visited Apr. 3, 2024).

for math and reading.[22] Pinecrest also does not provide Amelia with any family-like structure or support. Moreover, Amelia has been prescribed a number of psychotropic medications while there.

73.     As a direct result of Defendants' actions and inactions, Amelia has suffered and continues to suffer severe emotional and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate medical treatment, engaged in reasonable case planning and placement matching, acted in accordance with professional standards as to the management of Amelia's case, and not acted with deliberate indifference toward the circumstances creating a substantial risk of serious harm, Defendants may have prevented Amelia's condition from deteriorating while in state custody. As a result of Defendants' policies and practices, Amelia has been unnecessarily institutionalized and has not received the services that she requires, including medical, educational, and mental health services. She has also suffered physical and emotional harm. Amelia has been placed in institutions where neglect and abuse are rampant by an agency that is meant to serve as Amelia's parent and protect her from harm. Without relief, Amelia will continue to be deprived of meaningful connections with family and community and of the services that she needs to ensure her wellbeing such that she can become an independent, functioning adult. She will continue to suffer severe emotional and psychological harm; risk of serious additional psychological, emotional, and physical harm; placement instability; lack of appropriate services; and delayed permanency.

---

[22] *Pinecrest Supports & Services Center*, U.S. News, https://www.usnews.com/education/k12/louisiana/pinecrest-supports-services-center-142920 (last visited Mar. 4, 2024).

**C.**    **Joseph S.**

74.    Joseph S. is twelve years old and entered DCFS custody from Lafayette Parish. Since entering DCFS custody in June 2022, Joseph has already experienced four placement moves, all of which have been in institutional or hospital settings. Before entering DCFS custody, Joseph was diagnosed with autism spectrum disorder. His current diagnoses include autism spectrum disorder, impulse control disorder, and oppositional defiant disorder—which typically do not require hospitalization.

75.    In June 2022, when Joseph was ten, his mother relinquished custody of him to DCFS, because she was unable to care for him due to her own mental health and cognitive disabilities.

76.    DCFS first placed Joseph at an inpatient psychiatric hospital in Shreveport, Louisiana, where he stayed until August 31, 2022. Joseph received no schooling while he was there.

77.    DCFS then moved Joseph to New Way of Southwest, a psychiatric residential treatment facility, where Joseph was heavily medicated. Joseph stayed at New Way for almost ten months—not due to medical necessity, but rather because DCFS had no appropriate placements available.

78.    Pursuant to a physician's emergency certificate, DCFS transferred Joseph to Oceans Behavioral Hospital in Kentwood, Louisiana on or about June 23, 2023. Oceans is a short-term acute psychiatric inpatient treatment facility where patients stay for only a few days or weeks at most. Joseph, however, remained there for nearly five months—until November 15, 2023. Oceans' medical providers also reviewed Joseph's medications and determined that he had been

overmedicated and was taking some drugs that were not medically necessary. During this time, Joseph was involved in several conflicts with other patients and staff, resulting in him being placed in seclusion. He received no schooling while at Oceans.

79.    On or about November 15, 2023, Joseph was transferred to Nexus Children's Hospital in Houston, Texas, where he remains to this day. As DCFS cannot find Joseph a placement in Louisiana that can provide him with the services he needs, he is being forced to live at a children's hospital over 200 miles away from his community and family. Joseph's behavioral needs have still not been adequately diagnosed or addressed, and although he is on medication, it has been ineffective in adequately addressing Joseph's needs.

80.    Joseph's permanency plan goal is reunification with his biological mother, but his case plan does not state how this will be accomplished. Further, Joseph's mother is not in a position to care for him, and there is no indication that she will be equipped to care for him at any time in the near future. DCFS, therefore, has no realistic plan to achieve permanency for Joseph.

81.    As a direct result of Defendants' actions and inactions, Joseph has suffered and continues to suffer severe emotional and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate medical treatment, engaged in reasonable case planning and placement matching, acted in line with professional standards as to the management of Joseph's case, and not acted with deliberate indifference toward the circumstances creating a substantial risk of serious harm, Defendants may have prevented Joseph's condition from deteriorating while in state custody. Instead, Defendants' policies and practices, including insufficient service and placement array, has led to Joseph being placed in an institution hundreds of miles from his family and community and without having his medical and psychological needs

properly addressed. Without relief, Joseph will continue to suffer placement instability; lack of appropriate services; delayed permanency; severe emotional and psychological harm, and risk of serious emotional, psychological, and physical harm.

**D.    Alan W.**

82.    Alan is twelve years old and has been diagnosed with oppositional defiant disorder and ADHD.

83.    DCFS removed Alan and his sister from their mother's custody in October 2021. Alan was living in Tangipahoa Parish at the time. DCFS first placed Alan with his father where he participated remotely in school for a little over a year. He remained in DCFS custody during this time. In November 2022, DCFS removed Alan from his father's home after receiving reports that Alan's father had physically abused him, neglected him, and was starving him.

84.    Between November 2022 and January 2023, DCFS placed Alan in three different foster homes. Notwithstanding the prior abuse allegations, DCFS tried to convince Alan's father to take him back during this time, but his father refused. Alan's parents' parental rights were terminated in February 2023. Since that time, DCFS has failed to place Alan in an adoptive home or shown a plan to achieve any type of permanency for him.

85.    In March 2023, DCFS placed Alan in Cypress Grove Behavioral Health Hospital in Morehouse Parish after he made self-harming statements and refused to go to school. Despite Cypress Grove being a short-term acute psychiatric facility, DCFS allowed Alan to remain there for five months. During that time, he did not receive any schooling.

86.    At the end of August 2023, DCFS transferred Alan to Louisiana Methodist, a psychiatric residential treatment facility in Ruston, Louisiana. Professionals familiar with Alan's

case believe that Louisiana Methodist is too restrictive of a placement for Alan and that he should be placed in a therapeutic foster home. Despite this, DCFS has allowed Alan to remain there to this day.

87.    As a direct result of Defendants' actions and inactions, Alan has suffered and continues to suffer severe emotional and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate services to Alan, engaged in reasonable case planning and placement matching, acted in accordance with professional standards as to the management of Alan's case, and not acted with deliberate indifference toward the circumstances creating a substantial risk of serious harm, Defendants may have prevented Alan's condition from deteriorating while in state custody. Alan, however, has been unnecessarily institutionalized in placements that are more restrictive than necessary and has suffered from placement instability due to Defendants' aforementioned failures, policies, and practices. Without relief, Alan will continue to suffer placement instability; lack of appropriate services; delayed permanency; severe emotional and psychological harm, and risk of serious emotional, psychological, and physical harm.

### E.    Carter P.

88.    Carter is fourteen years old and entered DCFS custody from Tangipahoa Parish. He suffers from DiGeorge Syndrome, oppositional defiant disorder, and ADHD. DiGeorge Syndrome is an autoimmune disorder that can affect certain facial characteristics and cause heart defects and abnormalities in the thymus gland.

89.    Prior to entering DCFS custody, Carter and his four siblings lived with their parents on a compound in rural Louisiana, where they were subjected to abuse and neglect. DCFS took

the children into custody on October 23, 2012, and Carter's parents were incarcerated. Carter was three years old when he entered DCFS's custody.

90.    DCFS placed Carter with at least four different foster families between October 2012 and 2014. Initially, Carter and one of his siblings were placed together, but that sibling was later adopted. In 2014, Carter started having tantrums and exhibiting behaviors symptomatic of OCD. He also went to school with bruises on him.

91.    Carter's parents' parental rights were terminated in 2014. While DCFS placed Carter in a pre-adoptive home in December 2014, Carter was moved to a new foster home in 2015 and then to another one in 2016.

92.    In September 2018, DCFS placed Carter at the Louis Infant Crisis Center in Houma, Louisiana, where he remained for much of the next four years. The Louis Infant Crisis Center, which is now closed, was a state-funded facility that operated three residential group homes for foster children, for a total of twenty beds. In 2020, the facility wrote a letter to the Louisiana Legislature informing them that "funding deficiencies and policy changes were responsible for increasing numbers of traumatized children ages 12 – 17" and that as a result, the cost to care for these children had increased.[23] Despite this letter, the Legislature did not increase the funding to group homes providing residential services, and the Louis Infant Crisis Center was forced to close its doors in June 2022.

---

[23] *Closure of 40-Year Program for Abused and Neglected Children*, The Times (May 12, 2022), https://www.houmatimes.com/news/closure-of-40-year-program-for-abused-and-neglected-children/; *see also* Edith Nevis, *Providing Love and Care to Children in Need,* Houma Today (Feb. 9, 2017, 4:26 PM), https://www.houmatoday.com/story/lifestyle/2017/02/09/nonprofit-spotlight-louis-children-crisis-center/22507115007/.

93.    In 2021, DCFS placed Carter in a foster home in Alexandria, Louisiana, but due to DCFS's failure to properly address his behavioral issues, he was destructive in that home. DCFS subsequently moved Carter to another foster home in Independence, Louisiana.

94.    After Hurricane Ida hit the state in 2021, DCFS briefly transferred Carter to St. Mary's Residential Training School in Boyce, Louisiana—a residential treatment facility for children and adults with developmental disabilities and behavioral issues.

95.    That placement was short lived, as DCFS then transferred Carter back to the foster home where he had previously been placed. During that time, Carter showed signs of physical abuse, including bite marks and bruises. DCFS again removed Carter and placed him in two more foster homes between August 1, 2022, and early 2023.

96.    At some point in early 2023, DCFS moved Carter from the second foster home to Oceans Behavioral Hospital in Kentwood, Louisiana. Although Oceans is a short-term acute psychiatric facility that is only intended to serve patients for a few days, Carter remained there for approximately three months. During this time, DCFS received a report that Carter had been abused by a patient care technician.

97.    In March 2023, Carter was sent to another psychiatric hospital. Carter remained there for about three months, during which time he received no schooling. In May 2023, DCFS transferred Carter to Nexus Children's Hospital in Houston, Texas.

98.    Since taking Carter into custody, DCFS has placed Carter in approximately 17 different placements, many of which have been institutions. This has further traumatized Carter and greatly decreases the likelihood that he will achieve permanency, as he has not had an opportunity to form lasting relationships with adults in family-like settings and permanency

becomes less likely as the number of placements that a child has had increases. Moreover, due to the high number of placements and Carter's current institutionalization in Texas, he has been unable to maintain connections to his family or community or develop supportive and consistent adult relationships that are necessary for his well-being as he matures.

99.     Carter's permanency plan is adoption, but he is not currently in an adoptive home. Nor has DCFS made adequate attempts to find Carter an adoptive placement.

100.     As a direct result of Defendants' actions and inactions, Carter has suffered and continues to suffer emotional, physical, and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate medical and mental health treatment and services for Carter, engaged in reasonable case planning and placement matching, acted in accordance with professional standards as to the management of Carter's case, and not acted with deliberate indifference toward circumstances creating a substantial risk of serious harm, Defendants may have prevented Carter's condition from deteriorating while in state custody. Instead, Defendants' conduct, policies, and practices have resulted in Carter's unnecessary institutionalization, physical and psychological abuse, denial of necessary services, and isolation from his family and community. Without relief, Carter will continue to suffer placement instability; lack of appropriate services; delayed permanency; severe emotional and psychological harm, and risk of serious emotional, psychological, and physical harm.

**F.     Jackson J.**

101.     Jackson is sixteen years old and has been diagnosed with depression, ADHD, disruptive mood dysregulation disorder, conduct disorder, and intermittent explosive disorder.

102.    Jackson has repeatedly been in and out of foster care. Jackson's mother repeatedly placed him in DCFS custody or abandoned him at various hospitals. Despite his mother's actions, DCFS continues to return Jackson back to her custody.

103.    On December 3, 2022, DCFS placed Jackson in Cypress Grove, after Jackson's mother abandoned him at a hospital. The doctors determined that he was ready for discharge just four days later, but DCFS left him there for an additional two months. This lengthy stay caused Jackson to decompensate quickly and become verbally abusive and aggressive.

104.    DCFS only removed Jackson from Cypress Grove because his mental health attorney asked for a court appearance and for Jackson to be transported to court for the appearance. Once Jackson was transported to the court appearance, DCFS could not take him back to the hospital because he had already been ready for discharge.

105.    Due to the time that Jackson has spent in various hospitals, Jackson missed almost an entire year of school. He will likely fail his current grade and be set back a year.

106.    Due to a lack of appropriate placements, DCFS then placed Jackson at the Johnny Gray Jones Youth Shelter/Correctional Facility on February 10, 2023, a facility that has both a civil and criminal section. DCFS, however, never explained the circumstances of the facility or the move to Jackson, which lead Jackson to believe that he was being sent to a correctional facility. In part because of this confusion, Jackson ran away from the shelter just four days after arrival. DCFS was unaware of his whereabouts during this time. He was found approximately one week later on February 22, 2023, at which time DCFS returned him to Johnny Gray Jones Youth Shelter. Jackson, however, ran away again on March 21, 2023. He was found and returned to the shelter one day later. This cycle happened two additional times before Jackson's next placement.

107.    DCFS then placed Jackson in Caddo Parish Juvenile Detention Center on April 5, 2023—a secure facility and an inappropriate choice for a child not charged with any crimes. He ran away four days later. Between April and June 2023, DCFS cycled Jackson through a number of placements—two hotels, a children's home, Caddo Parish Juvenile Detention Center, and then a psychiatric inpatient facility. Jackson's pattern of running away has continued: he is currently on runaway status, meaning that DCFS does not know his location and cannot find him.

108.    As a direct result of Defendants' actions and inactions, Jackson has suffered and continues to suffer severe emotional and psychological harm. If Defendants had made reasonable professional judgments, provided Jackson with timely and appropriate services, identified appropriate placements and not left Jackson in hospitals or placed him in juvenile detention centers, acted in accordance with professional standards as to the management of Jackson's case, and not acted with deliberate indifference toward the circumstances creating a substantial risk of serious harm to him, Defendants may have prevented Jackson's condition from deteriorating while in state custody. Instead, Jackson's whereabouts are currently unknown, and he is at a severe risk of further harm due to DCFS's inability to provide him with the services he needs and to place him in appropriate placements. Without relief, Jackson will continue to suffer placement instability; lack of appropriate services; delayed permanency; severe emotional and psychological harm, and risk of serious emotional, psychological, and physical harm.

**G.    Justine S.**

109.    Justine is twelve years old and entered DCFS custody from Lafayette Parish at the age of ten. In January 2022, DCFS removed Justine and two of her siblings from their mother's care.

110.    Justine was placed in a certified foster home but was eventually removed at the foster parent's request.

111.    In November 2023, Justine was moved to a second certified foster home. DCFS did not provide the foster parent with the services and assistance necessary for her to adequately care for Justine. While there, Justine alleged that her foster parent hit her head against a window and would not allow her to make a phone call. Justine's CASA spoke with DCFS about Justine's allegations of abuse but was told by DCFS that the abuse allegations were not a basis for removal.

112.    On February 23, 2024, DCFS received a request from Justine's foster parent that Justine be removed from her care immediately. When DCFS took no action to remove Justine or visit the home, Justine's attorney and CASA called the DCFS hotline but were told by the hotline operator that all they could do was alert the DCFS supervisor of the situation and wait for a response. Justine's advocates also tried to reach her DCFS caseworker and supervisor to no avail. Due to DCFS's non-responsiveness and failure to assist Justine or her foster parent in the midst of the emergency request for removal, Justine's CASA went to the foster home to ensure that Justine was safe and to try to help with the removal. That evening, Justine's advocates were able to locate her biological grandmother, who DCFS had failed to previously contact, and to place Justine with her for the weekend.

113.    In failing to respond to the emergency call for removal, DCFS violated its own policy, which requires that it provide foster children and their caregivers with 24-hour emergency assistance. Moreover, in placing Justine in numerous foster homes rather than with her grandmother initially, DCFS failed in its obligation to search for and place children with willing relatives or kin when such individuals exist.

114.    Just three days after placing Justine with her grandmother, DCFS placed Justine back in her biological mother's home. A member of the household who had allegedly sexually abused Justine was living there at the time. Additionally, Justine had been receiving therapy prior to the move and had developed a strong relationship with her therapist. When DCFS placed Justine with her mother, they terminated all her mental health services without explanation.

115.    Medical professionals recommended that Justine receive dialectical behavioral therapy, which DCFS failed to provide. It has also been recommended that Justine receive family functioning therapy and counseling, which Justine is also not receiving. Despite being placed with her mother, Justine remains in DCFS custody. This means DCFS has an obligation to provide Justine and her family with the services necessary for Justine to be free from emotional, physical, and psychological harm and to achieve permanency.

116.    As a direct result of Defendants' actions and inactions, Justine has suffered and continues to suffer emotional, physical, and psychological harm. If Defendants had made reasonable professional judgments, provided Justine with timely and appropriate services, engaged in reasonable case planning and placement matching, acted in accordance with professional standards as to the management of Justine's case, and not acted with deliberate indifference toward the circumstances creating a substantial risk of serious harm, Defendants may have prevented Justine's condition from deteriorating while in state custody. Instead, Justine was placed with strangers rather than an available and willing relative, stripped of the mental health services that she desperately requires, and re-placed in her mother's home despite allegations that a member of the household had sexually abused her. Without relief, Justine will continue to suffer placement

instability; lack of appropriate services; delayed permanency; severe emotional and psychological harm, and risk of serious emotional, psychological, and physical harm.

**H.    Katrina R.**

117.    Katrina entered DCFS custody shortly after her birth in 2015 as a drug-affected newborn. DCFS initially placed her in a certified foster home and then with her maternal grandmother. She is now seven years old.

118.    As a result of having been exposed to cocaine and marijuana while in utero, Katrina demonstrated signs of withdrawal and experienced tremors, excessive crying, stiffness, difficulty finding comfort, and excessive feeding as a baby. Despite these issues, she appeared developmentally on target. DCFS spoke with Katrina's mother, and she agreed that Katrina should be placed with her grandmother.

119.    Nonetheless, in May 2015, DCFS learned that Katrina's grandmother had a criminal conviction from over a decade ago and removed Katrina from her care. Katrina was placed in an adoptive placement. Later that month, a hearing was held where the court granted a motion to place Katrina with her grandmother despite the prior conviction. Katrina was placed with her grandmother and DCFS closed its case.

120.    Katrina re-entered DCFS custody on April 30, 2019, at the age of four because her grandmother was unable to care for her. Since then, DCFS has moved Katrina ten times and she has been in at least seven different foster homes.

121.    Katrina's first placement was a therapeutic foster home, where she stayed for about a week. She was then moved to another foster home, where she stayed until June 26, 2019. DCFS then removed her and placed her in yet another foster home, where she stayed for almost nine

months until March 30, 2021. From March 31 to August 15, 2021, Katrina was placed in another therapeutic foster home. On August 15, DCFS removed Katrina and placed her in yet another foster home, where she stayed for nearly eight months until April 2022. Due to her frequent and numerous placement moves, Katrina received no continuity of services and did not have a consistent adult presence in her life during this time.

122.    In April 2022, DCFS placed Katrina with Claris Smith in a therapeutic foster home. DCFS provided Ms. Smith with seven days' notice before placing Katrina with her. DCFS advised Ms. Smith that Katrina had some behavioral problems—specifically, that she could be aggressive toward children—and that she required a higher level of care. DCFS told her that Katrina was not aggressive towards adults. Ms. Smith was told, however, that once Katrina felt comfortable with her, her behavioral issues should subside.

123.    Katrina was incredibly nervous when she arrived and had only a few age-appropriate possessions with her. Most of the clothing that Katrina brought with her did not fit.

124.    Shortly after Katrina arrived, Ms. Smith realized that DCFS had downplayed the level of care that Katrina needed and her aggression. Throughout Katrina's time with Ms. Smith, Katrina had numerous aggressive tantrums, destroyed property, and would bite Ms. Smith and pull her hair. Despite these behaviors, Ms. Smith grew deeply attached to Katrina and took it upon herself to get Katrina the services that she desperately needed but that DCFS failed to, and in some instances declined to, provide. For example, Ms. Smith requested that DCFS provide her and Katrina with parent-child intervention therapy, which DCFS declined to do. Instead, DCFS sent someone to the home to monitor Ms. Smith's parenting techniques, which did nothing to help Katrina or Ms. Smith.

125.    Around May 2022, Katrina had a psychiatric episode that required she be hospitalized. At the time, Katrina was with Ms. Smith visiting Ms. Smith's family out of state. Ms. Smith took Katrina to the hospital and was told that because she was in the custody of the state of Louisiana, they could not help her. Ms. Smith then drove Katrina approximately six hours to New Orleans, where Katrina was hospitalized. It was around this time that Ms. Smith learned that Katrina had not received any meaningful therapy while at any of her prior DCFS placements and instead had simply been medicated. Katrina had been prescribed Adderall and Clonidine. Those medications were later changed to Concerta and Guanfacine, and the Concerta was later replaced with Abilify.

126.    While Katrina was with Ms. Smith, Ms. Smith repeatedly asked DCFS for more information about Katrina's background and to see her case file. DCFS never provided either.

127.    Katrina also defecated in her pants for months at a time rather than using a toilet. DCFS told Ms. Smith that they had no evidence of whether Katrina had a history of sexual abuse, and they never provided Katrina with significant therapy or treatment for any underlying trauma before living with Ms. Smith. And even then, Katrina received consistent therapy due to Ms. Smith's efforts, not DCFS's.

128.    Throughout this time, Ms. Smith enrolled Katrina in dance classes and sports. In the spring of 2022, she advocated for Katrina to be enrolled in a therapeutic school. The school had small classroom sizes and a therapist and psychiatrist for the students. Nonetheless, Katrina continued to show aggressive behavior and to deteriorate. Because the therapeutic school provided only one hour of academic lessons per day, Ms. Smith asked DCFS to provide Katrina with extra tutoring. Were Katrina operating at grade level, she would have been in third grade. Because

Katrina had repeated kindergarten, however, she was behind. DCFS told Ms. Smith that they could not provide Katrina with extra tutoring because they only provided that service for children in third grade or above. As a result, Ms. Smith paid for Katrina's extra tutoring out of her own pocket.

129.    Katrina has a younger brother who was also in DCFS custody and has now been adopted. Ms. Smith was never told about Katrina's brother and discovered his existence only after having lived with Katrina for some time. Through Ms. Smith's efforts, Katrina was able to reconnect with her brother.

130.    Katrina was hospitalized multiple times while living with Ms. Smith but never received a firm diagnosis. To get Katrina the intensive help that she needed, Ms. Smith asked DCFS if there was a residential treatment facility that Katrina could be placed in for a few weeks or months where Ms. Smith could work alongside her to ensure that she received the treatment she needed. DCFS declined, and Ms. Smith learned that there were no such facilities for girls in Louisiana under the age of 13.

131.    When Katrina was first placed with Ms. Smith, Katrina's plan was adoption and Ms. Smith hoped to eventually adopt her. DCFS pressured Ms. Smith to adopt Katrina quickly and would often decline her requests for services by saying that once Ms. Smith adopted Katrina, she could get her whatever she wanted. By November 2023, Ms. Smith realized that Katrina needed more intensive services before she would be ready for adoption. DCFS declined to provide those services to Katrina and instead downplayed Ms. Smith's safety concerns and accused Ms. Smith of purposefully delaying the adoption process.

132.    In January 2024, at a wraparound services meeting, Ms. Smith continued to advocate for additional services for Katrina. During the meeting, Katrina's DCFS caseworker

stated in substance that there was nothing wrong with Katrina, that she did not need additional resources, and that she just had to behave better.

133.    A few days after that meeting, Katrina bit Ms. Smith, and Ms. Smith pulled Katrina off of her. Ms. Smith self-reported this incident to Katrina's DCFS caseworker, who was new to Katrina's case, and Katrina's Methodist Foster Care worker. As a result, the Methodist Foster Care worker went to Ms. Smith's house and initially stated that she would temporarily remove Katrina for a respite placement. The worker then pivoted and told Ms. Smith that there had been another permanent placement found for Katrina and that she had ten minutes to say goodbye.

134.    Katrina was removed from Ms. Smith's home and placed in a non-therapeutic foster home. When Ms. Smith spoke with DCFS about the removal, DCFS essentially stated that they deferred to the Methodist Foster Care worker's decision.

135.    DCFS investigated the incident that led to Katrina's removal and quickly cleared Ms. Smith of any abuse charges. Nonetheless, Katrina remains in the new foster home. Since removing Katrina from Ms. Smith, DCFS discontinued Katrina's therapy, destroying the 20-month relationship she had formed with her therapist.

136.    As a direct result of Defendants' actions and inactions, Katrina has suffered and continues to suffer emotional, physical, and psychological harm. If Defendants had made reasonable professional judgments, provided Katrina with timely and appropriate services, engaged in reasonable case planning and placement matching, acted in accordance with professional standards as to the management of Katrina's case, and not acted with deliberate indifference toward the circumstances creating a substantial risk of serious harm, Defendants may have prevented Katrina's condition from deteriorating while in state custody. Instead, Katrina has

been in at least seven foster homes before turning eight years old, has not found a permanent home or family, and has not received services necessary for her well-being and to prevent her from suffering additional harm. Without relief, Katrina will continue to suffer placement instability; lack of appropriate services; delayed permanency; severe emotional and psychological harm, and risk of serious emotional, psychological, and physical harm.

### I.    Mikaela S.

137.    Mikaela is sixteen years old and entered DCFS custody from Lafayette Parish in October 2020. In less than four years, Mikaela has been in twenty-seven placements.

138.    Mikaela first came into DCFS custody because her mother was unable to find housing. Despite this, Mikaela wants to live with her mother and has fled numerous placements in the hopes of reuniting with her mother. DCFS has failed to provide Mikaela's mother with the services that she needs to maintain a case plan and to be able to care for Mikaela.

139.    In January 2022, DCFS filed a petition to terminate Mikaela's mother's parental rights, but a continuance was requested and Mikaela's mother still maintains her rights.

140.    DCFS has placed Mikaela in numerous institutions over the past three years. As of January 2024, Mikaela has not attended school in almost two years.

141.    DCFS twice placed Mikaela at Louisiana Methodist Children's Home, a psychiatric residential treatment facility in Ruston, Louisiana—once for four months and, later, for seven months. Mikaela did not receive any schooling while she was there. DCFS also failed to provide

Mikaela with more than minimal independent living program services,[24] which she needs to eventually become an independent and self-sufficient adult.

142.    On October 22, 2023, DCFS placed Mikaela at Northlake Behavioral Hospital in Mandeville, Louisiana, the same facility where named Plaintiff Amelia was placed. Again, that facility lost its accreditation in 2022 due to, among other things, its inability to keep patients safe, unhygienic practices, improperly trained and understaffed workforce, and lack of services, all of which exposed patients to a risk of death. Despite these conditions, DCFS kept Mikaela at Northlake from October 22, 2023, to January 16, 2024. Mikaela received no education while there.

143.    Her DCFS caseworker appeared at a December 2023 court appearance and was unable to provide the judge with a diagnosis justifying Mikaela's placement at Northlake. The court ordered DCFS to return in January with that information. In the interim, Mikaela's DCFS worker left the agency and so she went without a caseworker for a time. At the January 2024 court appearance, DCFS reported that Mikaela had been diagnosed with depression and oppositional defiance disorder.

144.    On January 16, 2024, Mikaela was removed from Northlake and placed in Holistic Haven, a psychiatric residential treatment facility. While there, Mikaela was involved in physical altercations with other patients at the facility. The staff at Holistic Haven failed to address the fights or ensure Mikaela's safety moving forward. Mikaela is reportedly unhappy at Holistic

---

[24] "Independent living programs help youth in transition reach their goals by providing services and resources to help them more effectively and smoothly transition into adulthood with a sense of normalcy and permanent, stable connections." *Independent Living and Transitioning From Foster Care*, CHILD WELFARE INFORMATION GATEWAY, https://www.childwelfare.gov/topics/permanency/independent-living-and-transitioning-foster-care/ (last visited Apr. 3, 2024).

Haven and would like to return to her mother. Nonetheless, she remains at Holistic Haven today. DCFS does not provide Mikaela with independent living program services at Holistic Haven.

145.    Mikaela's permanency plan goal is adoption, despite Mikaela's mother maintaining her parental rights. DCFS has made no significant efforts to place Mikaela with an adoptive family.

146.    As a direct result of Defendants' actions and inactions, Mikaela has suffered and continues to suffer emotional, physical, and psychological harm. If Defendants had made reasonable professional judgments, provided Mikaela with timely and appropriate services, engaged in reasonable case planning and placement matching, acted in accordance with professional standards as to the management of Mikaela's case, and not acted with deliberate indifference toward her the circumstances creating a substantial risk of serious harm, Defendants may have prevented Mikaela's condition from deteriorating while in state custody. Instead, Mikaela has missed at least two years of schooling, further compounding the trauma and setbacks she has faced and is at risk of facing outside of those imposed by DCFS. DCFS has failed to ensure that Mikaela receives the educational, medical, and independent living program services that she needs to become a functioning and successful member of society and to be free from a risk of further harm. Moreover, DCFS has failed to provide Mikaela with appropriate placements in family-like settings and has instead moved her around 27 times, including to facilities like Northlake where abuse and neglect are rampant.  Without relief, Mikaela will continue to suffer placement instability; lack of appropriate services; delayed permanency; severe emotional and psychological harm; and risk of serious emotional, psychological, and physical harm.

IV.    **LEGAL FRAMEWORK**

147.    Defendants are violating constitutional principles and laws that provide for the safe and effective provision of services to children within a state's child welfare system.

148.    The applicable constitutional standards and federal statutes set out general and specific duties that states administering child welfare systems must comply with and with which Defendants are failing to comply.

A.    **The United States Constitution Imposes Affirmative Obligations on DCFS.**

149.    The Fourteenth Amendment of the United States Constitution provides that, when a state takes custody of a child, it "assumes the responsibility to provide for constitutionally adequate care."[25] This includes the "right to 'personal security and reasonably safe living conditions'"—including, "at [a] minimum . . . protection from physical abuse and violations of bodily integrity" and the "right to be free from severe psychological abuse and emotional trauma."[26] Louisiana is required to ensure that children are protected from actual harm and the risk of harm, according to the substantive due process clause of the Fourteenth Amendment. In addition, Courts have recognized that "the State's responsibility to protect foster children's 'general well-being' requires it 'to take steps to prevent children in state institutions from deteriorating physically or psychologically.'"[27] Louisiana must also implement the services necessary to ensure that foster children are free from harm.

150.    The United States Constitution also guarantees a right to familial association in the First, Ninth, and Fourteenth Amendments. Among other things, this right prohibits DCFS from

---

[25] *M.D. v. Abbott*, 907 F.3d 237, 250 (5th Cir. 2018) (alteration omitted) (quoting *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990)).

[26] *Id.* (quoting *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004)).

[27] *Id.* at 250-51 (citing *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990)).

denying Louisiana foster children meaningful contact with their parents and reasonable efforts and necessary services so they can reunite with their parents.

**B.    AACWA, the ADA, and the Rehabilitation Act Also Impose Affirmative Duties on DCFS.**

151.    Section 671(a)(16) of AACWA requires that DCFS provide a written "case plan" for each foster child that includes at least the following:

a)    A description of the type of home or institution in which a child is to be placed and a discussion of the safety and appropriateness of the placement;[28]

b)    A plan for assuring that the child receives safe and proper care, and that services are provided to the biological parents, child, and foster parents to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan);[29]

c)    The health and education records of the child;[30]

d)    For a child who is 14 or older: (i) a written description of the programs and services which will help the child prepare for the transition from foster care to a successful adulthood, *id.* § 675(1)(D); (ii) a document that describes the child's rights with respect to education, health, visitation, and court participation, *id.* § 675a(b)(1); and (iii) a signed acknowledgment by the child that they have been provided this document that the rights contained therein have been explained to them in an age-appropriate way;[31]

e)    In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find a suitable placement;[32]

---

[28] 42 U.S.C. § 675(1)(A)
[29] *Id.* § 675(1)(B).
[30] *Id.* § 675(1)(C).
[31] *Id.* § 675a(b)(2).
[32] *Id.* § 675(1)(E).

f)      In the case of a child with respect to whom the permanency plan is placement with a relative, a description of the steps the agency has taken to determine that it is not appropriate for the child to be returned home or adopted, the reasons for any separation of siblings, and the reasons why a permanent placement with the relative is in the child's best interests;[33] and

g)      A plan for ensuring the educational stability of the child while in foster care.[34]

152.    Section 671(a)(16) of AACWA also requires that DCFS have a "case review system," which ensures that:

a)      Each foster child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available an in close proximity to their parents' home, consistent with the best interest and special needs of the child;[35]

b)      If the child has been placed a substantial distance from the home of their parents, the case plan sets forth the reasons why such placement is in their best interests;[36]

c)      If the child has been placed outside of the state in which their parents are located, the case plan requires that a caseworker visit the child at their placement at least every six months and submit a report for each visit;[37]

d)      The status of each child is reviewed at least every six months by either a court or an administrative body to determine (i) the safety of the child, (ii) the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, (iii) the extent of progress that has been made toward mitigating the causes that led to placement in care, and (iv) project a likely date by which the child may be returned to and safely maintained in the home or placed for adoption or legal guardianship;[38]

---

[33] *Id.* § 675(1)(F)

[34] *Id.* § 675(1)(G).

[35] 42 U.S.C. § 675(5)(A)

[36] 42 U.S.C. § 675(5)(A).

[37] 42 U.S.C. § 675(5)(A).

[38] *Id.* § 675(5)(B).

e)      For a child for whom another planned permanent living arrangement has been determined as the permanency plan, the steps the agency is taking to ensure the placement is following the reasonable and prudent parent standard and to ascertain whether the child has regular, ongoing opportunities to engage in age or developmentally appropriate activities;[39]

f)      For each child in foster care for 15 of the most recent 22 months, DCFS (i) petition to terminate the parental rights of the child's parents, subject to statutory exceptions; and (ii) concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child.[40]

153.    Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[41] Likewise, the Rehabilitation Act prohibits disability discrimination by recipients of federal funds.[42]

154.    Together, the Rehabilitation Act and the ADA require DCFS to do the following:

a)      provide foster children with disabilities an equal opportunity to access the benefits that are provided to those without disabilities;[43]

b)      administer services, programs, and activities in "the most integrated setting appropriate" to the needs of children disabilities—i.e., the setting that enables children with disabilities to interact with nondisabled persons to the fullest extent possible;[44] and

c)      make available a full range of home and community-based placements, and necessary and appropriate community-based services, to ensure access to the least restrictive and integrated setting appropriate to their needs.[45]

---

[39] *Id.*
[40] *Id.* § 675(5)(E).
[41] 42 U.S.C. § 12132.
[42] *See* 29 U.S.C. § 701, *et seq.* Given that the applicable provisions of the ADA and the Rehabilitation Act are "co-extensive," courts typically discuss both claims together. *M.R. v. Dreyfus*, 697 F.3d 706, 733 (9th Cir. 2012).
[43] *See* 28 C.F.R. § 35.130(b)(1)(iii)
[44] *See* 28 C.F.R. § 35.130(d); 28 C.F.R. Pt. 35, App. B
[45] *See* 42 U.S.C. § 12131 *et seq.*; 29 U.S.C. § 701, *et seq.*; 28 C.F.R. § 35.101, *et seq.*; 45 C.F.R. § 84.1, *et seq.*

## V.    DCFS HISTORICALLY OPERATED WITH DELIBERATE INDIFFERENCE TO AND IN VIOLATION OF THE RIGHTS OF LOUISIANA'S FOSTER CHILDREN.

### A.    DCFS Has Been Understaffed and Dysfunctional for More than a Decade.

155.    Many of DCFS's failures can be traced back to former Governor Jindal's efforts to dramatically shrink the Louisiana state government while in office from 2008 to 2016.

156.    Before 2008, DFCS had approximately 5,100 full-time employees and a budget of $1.2 billion. From 2008 to 2016, Governor Jindal slashed a third of DCFS's employees and cut its budget nearly in half, leaving the agency with 3,300 full-time employees and a budget of approximately $681 million by 2016.[46] In that same period, Louisiana's population grew by 5.5% from approximately 4.4 million people to nearly 4.7 million people.[47]

157.    The long-term impact of this downsizing has harmed both the caseworkers and Louisiana foster children. As of 2016, the media reported that these budget cuts "forced state caseworkers to take on . . . overwhelming caseload[s]."[48] A foster parent expressed concern to one media outlet that the caseworkers who remained "had to take on the workloads of other workers that weren't able to be replaced" and doubted that task "was humanly possible."

158.    In response to media reports in 2016 that several foster children had to sleep in DFCS offices due to a lack of placements, then-Secretary Walters acknowledged: "We don't have the staff we need to go recruit new foster parents. We don't have the number of therapeutic foster

---

[46] Lee Zurik & Tom Wright, *Zurik: The Jindal Effect Takes a High Toll at DCFS*, Fox8 (July 1, 2016, 6:35 PM), https://www.fox8live.com/story/32351415/zurik-the-jindal-effect-takes-a-huge-toll-at-dcfs/.

[47] *Our Changing Population: Louisiana*, USA Facts, https://usafacts.org/data/topics/people-society/population-and-demographics/our-changing-population/state/louisiana/?endDate=2016-01-01&startDate=2008-01-01.

[48] Lee Zurik & Tom Wright, *Zurik: The Jindal Effect Takes a High Toll at DCFS*, Fox8 (July 1, 2016, 6:35 PM), https://www.fox8live.com/story/32351415/zurik-the-jindal-effect-takes-a-huge-toll-at-dcfs/.

homes we need for special children with special needs. And so it's just painful all the way around." Secretary Walters presciently warned: "We'll be paying for this for years and years and years."

**B.    DCFS Was Repeatedly Warned of Its Deficiencies and Failed to Act.**

159.    When former Governor Jon Bel Edwards took office in 2016, his own DCFS transition committee issued a dire warning that DCFS was "underfunded and understaffed," "the populations most in need are underserved," and "child safety is at risk." The committee issued a report, which found that DCFS was "gutted" and "ineffective."[49]

160.    Among other things, the report noted the following concerns:

a)    **Understaffing.** "The department has been severely understaffed since . . . 2010," which "has resulted in cascading difficulties that directly impact the populations that DCFS is meant to serve." Among other things, "[c]aseworkers are working many overtime hours to keep up with unrealistically high caseloads, but because there is no money appropriately budgeted to compensate for overtime hours, workers are being asked to take involuntary time off to compensate them for those hours."

b)    **Inadequate Training.** "With tremendously high staff turnover," DCFS's *four* trainers could not "keep up with training new hires or continued training for veteran employees." And "[w]ith limited mentoring due to high staff turnover, training is paramount."

c)    **Overwhelming Caseloads.** "The current average caseload exceeds national and state standards," with "[s]ome caseloads exceed[ing] 40 cases per worker." These high caseloads "adversely affect[] both capacity and quality of services." Simply put: "[C]aseworkers are overwhelmed."

d)    **High Staff Turnover.** DCFS child welfare workers had only "[a]n 18-month average lifespan," and although turnover "is averaging

---

[49] Comm. on Children & Family Servs. Members, Onward Louisiana: Transition Committee on Children and Family Services 9-10, 13, 15 (Jan. 21, 2016), https://www.gov.louisiana.gov/assets/docs/TransitionTeam/DCFS_ Transition_Final_Report.pdf; *see also* Andrea Gallo, *Louisiana Is Flush with Cash. Why Is Child Welfare Still 'Woefully Underfunded'?*, Nola.com (Oct. 20, 2022), https://www.nola.com/news/louisiana-is-flush-with-cash-why-is-child-welfare-still-woefully-underfunded/article_bdb9c958-4fe1-11ed-b216-53ee629aaf56.html.

around 24% statewide, . . . that number is actually worse in several regions."

e) **High Foster Care Home Turnover.** DCFS is "currently churning through new foster homes at a high rate." Among other things, this "lack of placement resources" has forced children "to sleep in local [DCFS] offices."

161.    The report concluded that "sweeping changes in [DCFS's] leadership, policy and department climate" were necessary to address these issues. The committee cautioned that if DCFS "[c]ontinu[es] to do more with less," it "will have a devastating effect on Louisiana's most vulnerable population, our children." And it stated that "[u]ntil DCFS is adequately funded, the department will struggle to carry out its mission in providing care for children and families."

162.    Despite these warnings, DCFS's deficiencies worsened.[50]

163.    In 2017, the Louisiana Legislative Auditor issued a report regarding its performance audit of DCFS.[51] The report concluded that DCFS "faces significant challenges, such as high caseloads and turnover, which affect staff's ability to conduct all of their required activities." The report raised the following (now-familiar) concerns:

a) **Understaffing.** DCFS "did not have adequate numbers of experienced staff to consistently comply with internal performance expectations and program requirements set by the U.S. Department of Health and Human Services' Children's Bureau." While the number of children in foster care *increased* by 3.6% from 2012 to 2016, the number of caseworkers *decreased* by 3.3%. DCFS acknowledged that "[s]taffing issues have permeated the department for the past nine years and have impacted compliance in many areas."

---

[50] *See* Andrea Gallo, *Louisiana's Child Welfare Agency Remains in a 'Downward Spiral.' Can New Leader Turn It Around?*, Nola.com (Feb. 23, 2024), https://www.nola.com/news/louisiana-keeps-losing-child-welfare-workers-in-droves/article_a2174f14-8c94-5217-ae6e-3111460d8d0b.html#tncms-source=featured-top.

[51] Daryl G. Purpera, CPA, CFE. *Oversight of the Foster Care Program Department of Children and Family Services.* Louisiana Legislative Auditor (issued Aug. 9, 2017).

b)    **Overwhelming Caseloads.** "[H]igh caseload was cited most frequently by caseworkers as their greatest challenge in providing appropriate and effective foster care services." "[C]aseworkers carried an average of 16 cases in 2016," which is higher than the maximum of 10 cases established in DCFS's policy." The percentage of caseworkers assigned 11 or more cases increased from 27.6% in 2012 to 47.1% in 2016. 77.3% of caseworkers surveyed disagreed or strongly disagreed with the statement that "their caseload allows them sufficient time to provide children and families with quality services they need."

c)    **High Staff Turnover.** Foster care field staff turnover increased from 16.3% in 2012 to 23.7% in 2016, which "presents a significant challenge for caseworkers in providing appropriate and effective services."

d)    **Ineffective Data Systems.** "DCFS management does not have accurate or complete data to sufficiently oversee the foster care program." DCFS acknowledged that it "does not have a comprehensive child welfare information system." The report found that 63% of the 3,043 children who entered foster care in 2016 had no documentation in DCFS's "TIPS" database of a required initial behavioral health assessment. As a result, DCFS management "has no way of knowing if caseworkers conduct these assessments," based on what is in the TIPS database. And "DCFS is unable to globally monitor performance using [its] existing data systems."

e)    **Lack of Criminal Background Checks.** In 2016, 34% of 464 non-certified foster care providers did not receive criminal background checks within the mandated fifteen-day window, and 28.9% did not receive any criminal background check at all. Between 2012 and 2016, DCFS "allowed nine certified providers with prior valid cases of abuse or neglect to care for foster children. "One of the certified providers . . . had multiple prior valid cases of abuse and neglect," but nevertheless "was allowed to continue caring for children and subsequently physically abused another foster child in their care."

f)    **Lack of Access to Medical and Mental Healthcare.** Of the 2,808 children who entered foster care, 38.4% did not receive an initial medical visit within seven days, as required by DCFS policy. And 23.1% of foster parents surveyed stated that "they faced challenges in obtaining needed physical and behavioral health services for the children they care for."

g)    **Insufficient Placements.** In 2016, "there were approximately 2,479 placement resources in use for approximately 4,423 foster children." There is also alarming rate of "churn[]" among foster family homes. Although DCFS "certifies between 700 and 800 regular foster family homes each year," it "closes about the same number" every year.

h)    **High Placement Instability.** In 2016, 17.9% of foster care children in Louisiana had three or more placements during a less than twelve month period. DCFS did not meet the national standard for placement stability any fiscal year from 2008 to 2016.

164.    In 2018, the U.S. Department of Health and Human Services completed a "Child and Family Services Review" of DCFS, which echoed many of the concerns identified in the 2016 DFCS transition committee report and the 2017 Louisiana Legislative Auditor's report. The 2018 Review found that the agency was not in "substantial conformity" with *twelve out of fourteen* federal requirements for state child-welfare programs.[52]

165.    The 2018 Review determined that DCFS was not in "substantial compliance" with *any* of the seven outcomes that were evaluated. This meant that children in Louisiana's foster care system were not:

a)    sufficiently protected from abuse and neglect;

b)    safely maintained in their homes when possible;

c)    given permanency and stability in their living situations;

d)    given the opportunity to maintain family relationships and connections;

e)    given services to give their families the capacity to provide for their needs;

f)    provided appropriate services to meet their educational needs; or

---

[52] Administration for Children and Families, *Final Report: Louisiana Child and Family Services Review* (2018).

g)      given adequate services to meet their physical and mental health needs.

166.    The 2018 Review also concluded that DCFS was not in "substantial conformity" with five of the seven systemic factors that were evaluated, finding that DCFS lacked (i) an adequate statewide information system, (ii) an appropriate case review system, (iii) adequate training; (iv) an adequate array of services and system for providing services; and (v) an adequate system for foster and adoptive parent licensing, recruitment and retention.

167.    Key findings included the following:

a)      **Limited Access to Services.** "Stakeholders interviewed . . . noted multiple barriers to individualizing services, including services not being available locally, limited services in rural communities, and waiting lists for services to medically fragile children and to children and parents with intellectual disabilities."

b)      **Inadequate Training.** Caseworker training "is very basic and does not sufficiently prepare the [caseworker] staff to do their job," nor do new caseworkers appear to be "completing initial training within the allotted time."

c)      **Poor Data Entry.** "[D]elays in data entry [by DFCS staff] result in an inability to consistently identify a child's current placement location."

168.    The 2018 Review explained that DCFS "had experienced years of budgetary restrictions that negatively affected the workforce, service providers, and organizational capacity to achieve child and family outcomes."

169.    Notably, DCFS has steadily worsened over time. It performed *worse* on the 2018 Review than it had on the prior Child and Family Services Reviews completed by the federal government in 2004 and 2010. In 2004, the federal government found that DCFS was not in

"substantial conformity" with six out of fourteen federal requirements.[53] By 2010, it was not in "substantial conformity" with nine out of fourteen federal requirements.[54] By 2018, the federal government concluded that DCFS was not in "substantial conformity" with *twelve* of the fourteen federal requirements for state child welfare programs.

170.    The story told by these federal audits is clear: Louisiana knows that it is failing to ensure safety outcomes for children, yet has failed to reverse those outcomes. To the contrary, Louisiana's performance has steadily worsened on the "systemic factors"—that is, the structures that support the delivery of foster care services and thus affect those outcomes.

171.    In 2019, DCFS released its Annual Progress and Service Report to provide an update on the status of its performance improvement plan that it implemented in response to the 2018 Review.[55] The report identified the following "root causes" of DCFS's failures:

a)    **Understaffing.** "There has been a significant decline in staff and increase in the Child Welfare client population."

b)    **Overwhelming Caseloads.** "Caseloads have increased to one and a half more than the policy standard on average." Caseloads "have become unmanageable for staff, leaving staff members to prioritize most important task over others."

c)    **Inadequate Training and Supervision.** "Supervisors are functioning outside of their leadership roles, some are carrying cases and unable to provide the supervision, guidance and support to their employees." And "[i]nexperienced staff with minimal supervision and support become less confident in their abilities to complete adequate assessments or make safety and permanency decisions." Supervisors are also being promoted "at a faster rate," with less experience and capacity to provide strong supervision and guidance to staff."

---

[53] Administration for Children and Families, *Final Report: Louisiana Child and Family Services Review* at 2-3 (Feb. 5, 2004).
[54] Administration for Children and Families, *Final Report: Louisiana Child and Family Services Review* at 2-4 (June 2010).
[55] La. Dep't of Children & Family Servs., *2019 Annual Progress and Service Report* at 216.

d)     **Inadequate Services.** "[T]here [are] insufficient resource[s] to support client needs"—including "foster homes" and "client services."

172.    Again, however, no meaningful changes were made. Despite knowing of the dangers posed to Louisiana's foster care children by its myriad deficiencies, DCFS's failures persisted.

## VI.   DCFS CONTINUES TO OPERATE WITH DELIBERATE INDIFFERENCE TO AND IN VIOLATION OF THE RIGHTS OF LOUISIANA'S FOSTER CHILDREN.

173.    The following DCFS policies and practices continue to harm Louisiana's foster children: (i) high turnover and overwhelming caseloads, (ii) high placement instability and inadequate placement array, (iii) inadequate training and supervision, (iv) inadequate provision of essential services, (v) inadequate case plans and case review systems, and (vi) failure to achieve permanency for children.

### A.   DCFS's Policies and Practices Cause High Case Worker Attrition, Leading to Overwhelming Caseloads that Harm Louisiana's Foster Children.

174.    Employee retention has been, and continues to be, a serious problem. Statewide, more than a fifth of the workforce turned over in fiscal years 2021 and 2022, with turnover rates exceeding 45% in some regions.[56] DCFS admits that the "level of experience at the supervisory and management level remains lower than desired" because of this turnover.

175.    While DCFS hired additional workers after a slew of child deaths in 2022, it lowered educational requirements for workers to aid in doing so. According to Secretary Matlock's

---

[56] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 565-77.

recent statements, the hiring "has not proven a long-term solution," given the high turnover rate.[57]

In Baton Rouge, for example, the turnover rate is 58% and half the child welfare work force left

in 2023. Secretary Matlock attributes the turnover to DCFS's failure to "onboard those people

effectively and efficiently and quickly." This high turnover is no doubt caused in part by low

worker salaries, inadequate training, frustration by workers at the lack of adequate services for the

children and families, and the lack of available services to help workers do their critically important

jobs.

176.    This rampant turnover has compounded an already disastrous understaffing

problem at DCFS. In fall 2022, then-Secretary Walters said: "When we walked in the door [in

2016], we were 500 case workers down, including 500 child welfare staff, and we have never

replaced those 500."[58] The number of allocated workers is both too low and the agency cannot fill

all the allocated positions or retain the workers it has.

177.    According to then-Secretary Walters, even if DCFS managed to fill all the vacant

positions, it would still need to hire approximately *245 more employees* "to carry the caseload that

[DCFS] currently ha[s]." Former Secretary Ricks agreed, stating that "even if [DCFS] had all

available positions filled, [it] would probably need more to handle the workload."[59] Indeed, even

after DCFS increased its hiring in early 2023, its total staff was still only 3,589—more than *1,500*

---

[57] *See* Andrea Gallo, *Louisiana's Child Welfare Agency Remains in a 'Downward Spiral.' Can New Leader Turn It Around?*, Nola.com (Feb. 23, 2024), https://www.nola.com/news/louisiana-keeps-losing-child-welfare-workers-in-droves/article_a2174f14-8c94-5217-ae6e-3111460d8d0b.html#tncms-source=featured-top.

[58] Scottie Hunter, *THE INVESTIGATORS: DCFS Employees Describe Morale Issues, Challenges of Working for Agency*, WAFB9 (Aug. 22, 2022, 7:33 PM), https://www.wafb.com/2022/08/22/investigators-dcfs-employee-describes-morale-issues-challenges-working-agency/.

[59] James Finn, *Louisiana's Troubled Child Welfare Agency Hires Hundreds – But Challenges Remain*, The New Orleans Advocate (Mar. 8, 2023), https://www.nola.com/news/politics/louisiana-dcfs-still-facing-challenges-despite-new-hires/article_be17fe4c-bd1e-11ed-a9b4-abbfc3dcd0b3.html.

*fewer employees* than the 5,100 who worked for DCFS in 2008. According to media reports, DCFS hired an average of eight workers but lost an average of twelve every pay period in 2023.[60] But, despite this insufficient workforce, DCFS receives tens of thousands of reports of abuse and neglect each year—51,639 in 2022—and is responsible for thousands of children—6,272 in 2022—in foster care.[61] DCFS cannot adequately conduct investigations or serve the children in its care based on its current capacity.

178.    Recent media reports have noted that "[t]he number of cases continues to outpace the staff available to work them, . . . with some workers juggling more than 20 new cases each month."[62] "[S]everal case workers said in interviews" by one media outlet "that they averaged between 25 and 30 cases a month at their most stressed."[63] Other media outlets have noted that caseloads at DCFS "are three times higher than the national standard" of no more than 12-15 in-custody children on a caseload at any one time. Some caseworkers report having caseloads of "more than 100 cases,"[64] The media has also noted that the 43% rise in child abuse and neglect

---

[60] Andrea Gallo, *Louisiana's Child Welfare Agency Remains in a 'Downward Spiral.' Can New Leader Turn It Around?*, NOLA.COM (Feb. 23, 2024), https://www.nola.com/news/louisiana-keeps-losing-child-welfare-workers-in-droves/article_a2174f14-8c94-5217-ae6e-3111460d8d0b.html#tncms-source=featured-top.

[61] Department of Children & Family Services, DCFS Services Statewide in Federal Fiscal Year 2022, *Fact Sheet* (March 2023), DCFS_2023_FactSheet.pdf (louisiana.gov).

[62] James Finn, *Louisiana's troubled child welfare agency hires hundreds – but challenges remain*, THE NEW ORLEANS ADVOCATE (Mar. 8, 2023), https://www.nola.com/news/politics/louisiana-dcfs-still-facing-challenges-despite-new-hires/article_be17fe4c-bd1e-11ed-a9b4-abbfc3dcd0b3.html

[63] Andrea Gallo, *Huge caseloads, high stakes: The dire situation Louisiana's child welfare workers face*, THE NEW ORLEANS ADVOCATE (Sept. 25, 2022), https://www.nola.com/news/huge-caseloads-high-stakes-the-dire-situation-louisiana-s-child-welfare-workers-face/article_0b9472c4-39bf-11ed-bc86-6bbfcc29fcae.html.

[64] James Finn, *Louisiana's troubled child welfare agency hires hundreds – but challenges remain*, THE NEW ORLEANS ADVOCATE (Mar. 8, 2023), https://www.nola.com/news/politics/louisiana-dcfs-still-facing-challenges-despite-new-hires/article_be17fe4c-bd1e-11ed-a9b4-abbfc3dcd0b3.html

reports from 2022 to 2023 compounded the difficulties caused by the staffing shortage, "especially given that more than a third of frontline staffers were new hires."[65]

179.    DCFS does not publish the total number of cases handled by its foster care caseworkers each month or each year. DCFS also does not publicly report how many caseworkers exceed the state standard of ten open cases (or fifteen for residential placement).[66]

180.    Further, although DCFS policy limits new foster care caseworkers to seven open cases at a time during their first six months,[67] the agency recently acknowledged that "many new workers have had to exceed those limits due to 'extenuating circumstances.'"[68]

181.    And even then, DCFS's caseload numbers are misleading. DCFS policy states that a "foster care case manager's caseload size is the total number of foster children cases assigned to the case manager," but DCFS excludes "service to parents cases" and "cases of foster parents or noncertified caretakers of foster children" from its caseload limit.[69]

182.    Moreover, even with DCFS's purported efforts to hire and retain new caseworkers, average caseloads increased from 2021 to 2022 in six of nine parishes, according to Louisiana's 2024 Annual Progress and Services Report.[70]

---

[65] Andrea Gallo, *Louisiana's child welfare agency remains in a 'downward spiral.' Can new leader turn it around?*, NOLA.COM (Feb. 23, 2024), https://www.nola.com/news/louisiana-keeps-losing-child-welfare-workers-in-droves/article_a2174f14-8c94-5217-ae6e-3111460d8d0b.html#tncms-source=featured-top.

[66] Department of Children and Family Services, *Child Welfare, 6-635 – Caseload Size and Caseload Coverage*, (eff. Feb. 1, 2015), https://public.powerdms.com/LADCFS/tree/documents/402738.

[67] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 563.

[68] James Finn, *Louisiana's troubled child welfare agency hires hundreds – but challenges remain*, THE NEW ORLEANS ADVOCATE (Mar. 8, 2023), https://www.nola.com/news/politics/louisiana-dcfs-still-facing-challenges-despite-new-hires/article_be17fe4c-bd1e-11ed-a9b4-abbfc3dcd0b3.html.

[69] Department of Children and Family Services, *Child Welfare, 6-635 – Caseload Size and Caseload Coverage*, (eff. Feb. 1, 2015), https://public.powerdms.com/LADCFS/tree/documents/402738.

[70] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 566.

183.    The staffing shortage and high caseloads are two sides of the same coin: when staff leave, caseloads naturally rise; as caseloads rise, staff are overwhelmed and quit. Media reports have described desperate caseworkers, working twelve-hour days and six-day weeks to keep up with their cases,[71] who have become "miserable" because of the lack of "support [for] rank and file staffers coping with huge caseloads."

184.    And when caseworkers are overworked and quit, children suffer. As former Secretary Walters stated, "Staffing affected every single decision we make . . . . When you've got somebody out on [family and medical leave] and somebody else just had a baby and three people have retired and one has quit, somebody has to pick up all those cases . . . which means instead of my 12 (cases) that I should have, I've now got 20."[72]

185.    Upon information and belief, although DCFS caseworkers are supposed to visit foster children once per month, they do not. The high caseloads make it impossible for caseworkers to visit a home each month, prepare their monthly reports for the court, and obtain the necessary services for families and children. As former Secretary Walters stated in August 2022, "[w]e don't have enough caseworkers and so there are times that foster parents feel like they're being ignored." "They need help and they're calling their worker, and their worker's not calling them back, and so they feel neglected."[73]

---

[71] Andrea Gallo, *Louisiana is failing its most vulnerable children, with deadly consequences*. NOLA.COM (Aug. 21, 2022), https://www.nola.com/news/article_1d14054e-1f40-11ed-900c-cb4f9af23c6b.html.

[72] Kaylee Poche, *Baby Steps: Despite recent changes, Louisiana struggles to recruit foster care workers and parents,* NOLA.COM (Aug. 1, 2022), https://www.nola.com/gambit/news/the_latest/baby-steps-despite-recent-changes-louisiana-struggles-to-recruit-foster-care-workers-and-parents/article_ff40df64-0e88-11ed-92d4-cb768aafcc8c.html.

[73] Kaylee Poche, *Baby Steps: Despite recent changes, Louisiana struggles to recruit foster care workers and parents,* NOLA.COM (Aug. 1, 2022), https://www.nola.com/gambit/news/the_latest/baby-steps-despite-recent-changes-louisiana-struggles-to-recruit-foster-care-workers-and-parents/article_ff40df64-0e88-11ed-92d4-cb768aafcc8c.html.

186.    A 2022 survey of DCFS child welfare caseworkers confirmed as much. Survey respondents expressed "concern[] that high caseloads and limited resources prevent them providing quality services from children and families."[74]

187.    DCFS's persistently high caseloads have harmed Louisiana's foster children, as the state has repeatedly admitted. In a 2016 survey, "caseworkers reported that providing quality services to foster children and families, transporting children to appointments, entering documentation in the systems timely, submitting court reports timely, and effectively planning cases *all suffer due to their high caseloads*."[75] In addition, 77.3% of foster care caseworkers surveyed either disagreed or strongly disagreed with the statement that "their caseload allows them sufficient time to provide children and families with quality services they need."

188.    Louisiana has also acknowledged that "staff turnover . . . negatively impacts children." While "a child who has one caseworker throughout their time in the child welfare system has a 74.5% chance of finding a permanent family," that chance "decreases to a 17.5% chance if they have two caseworkers, and to only 0.3% if they have five or more caseworkers."  Indeed, "the principle seems obvious: when workloads exceed caseworker bandwidth, caseworkers are not able to effectively safeguard children's health and well-being."[76]

189.    The high turnover and unmanageable caseloads also prevent caseworkers from adequately supervising children in the foster care system. According to DCFS's 2019 Annual Report, monthly caseworker visits were only at 46.71% in Fiscal Year 2019—meaning that

---

[74] La. Dep't of Children & Family Servs., *Child Welfare Job Satisfaction Survey*, Louisiana Legislative Auditors (issued Dec. 1, 2022), https://app.lla.state.la.us/publicreports.nsf/0/d30ce8b327892bb38625890b007621e0/ $file/0000039eb.pdf?openelement&.7773098.
[75] La. Dep't of Children & Family Servs., *Oversight of the Foster Care Program*, Louisiana Legislative Auditor (issued Aug. 9, 2017) at 5 (emphasis added).
[76] *Abbott*, 907 F.3d at 265.

monthly visits were made less than half the time, even though it is a federal requirement that children in foster care be visited monthly.[77] And according to DCFS's 2024 Annual Progress and Service Report, only 66.7% of cases reviewed in 2022 noted the state's timeliness of initiating investigations of reports of child maltreatment as a "strength."[78] This all helps to explain why Louisiana was ranked 49th in the country for overall child well-being, according to a 2023 report by the Annie E. Casey Foundation.[79]

**B.    DCFS's Placement Instability and Lack of Adequate Placements Harm Louisiana's Foster Children.**

*i.    Placement Instability Harms Children.*

190.    Research and child welfare experience show that, for children in foster care, placement stability is essential, and instability can hamper a child's development, wellbeing, and opportunities for placement with permanent families. The National Center for Child Welfare Excellence noted that "as the number of placement changes increases, there is a decreased likelihood of children and youth achieving reunification or adoption." Moreover, "[a]s children experience placement disruptions, they can develop a sense of profound distress, loss and absence of belonging which can then lead to feelings of distrust and fear about forming healthy relationships with others."

191.    When children move between placements, they lose continuity of schooling, are often separated from their siblings, and often experience disruption or unavailability of the necessary mental, medical, and behavioral health services. Over time, these children develop

---

[77] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 315.
[78] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 64.
[79] Annie Casey Foundation, *2023 Kinds Count Data Book State Trends in Child Well-Being*, (June 14, 2023), https://assets.aecf.org/m/databook/aecf-2023kidscountdatabook-embargoed.pdf at 19.

weaker interpersonal relationships and support networks. In one study, children with unstable placements had between a 36% and 63% greater risk of developing behavioral challenges than children who enter stable placements early in their time in foster care. Placement instability is especially harmful to members of the ADA Subclass, as children who are diagnosed with physical, mental, intellectual, or cognitive disabilities often find that their health conditions worsen while in foster care—especially when they do not receive consistent access to the services that they need.

192.    Despite the significant harmful effects of placement instability, DCFS continues to shuffle children through multiple placements. As of 2021, nearly a fifth of children in Louisiana's foster care system had three or more placements within their first twelve months in foster care.[80] According to DCFS's 2024 Annual Progress and Service Report, "[t]he Statewide Data Indicators continue[] to show Placement Stability as an area Louisiana is performing below national performance."[81] Among other things, "30% of Louisiana children coming in to foster care get moved [to a different placement] within first 10 days and 40% get moved within the first 30 days."

193.    In 2021, 67% of children who had been in care at least 24 months had three or more placements, 39.9% of children in foster care between 12 months and 24 months had three or more placements, and 17.8% of children in care under 12 months had three or more placements.

194.    Louisiana does not publicly report data on how many children have more than three placements, but it is anticipated that the number is unacceptably high. The available data shows unequivocally that DCFS moves children so frequently as to expose them to a risk of substantial physical or psychological harm as a result of placement instability.

---

[80] CHILDREN'S BUREAU, *Outcome 6: Placement Stability*, https://cwoutcomes.acf.hhs.gov/cwodatasite/sixOneLessThan12/index (last visited Mar. 4, 2024).

[81] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 64.

*ii. Louisiana Does Not Have Enough Adequate Foster Care Placements.*

195.    Federal law and widely-accepted professional standards require DCFS to place each child in the most appropriate and least restrictive placement that best suits the child's needs. *See* 42 U.S.C. § 622(b)(8)(A)(iii); 42 U.S.C. § 675(5)(A). DCFS policy also dictates that foster children must be placed "in a care setting which is the least restrictive, most appropriate setting available and in close proximity to the [child's] home, consistent with the best interest and special needs of the child."[82] There is also extensive child welfare literature emphasizing the need to carefully choose each child's placement in light of all available information and doing the utmost to minimize placement in institutions and group homes.

196.    Even so, DCFS fails to recruit, train, certify, and support enough available foster homes and other community-based placements. As of January 2024, there were more than 4,000 children in foster care in the state but only 1,620 certified foster families.[83] More than a quarter of these homes were for specific children, meaning they were kinship foster placements opened only to take in a specific child.

197.    Moreover, children with significant behavioral health or physical disabilities who cannot live with a foster family often have no place to go. As of 2016, Louisiana had only ten therapeutic homes—with a total of 85 beds—for the whole state.[84] This means that foster children requiring therapeutic homes are often placed in psychiatric facilities and, if no such facilities are

---

[82] La. Dep't of Children & Family Servs., *Child Welfare, 6-300 Guidelines for Selecting a Care Setting/Replacement Resource* (eff. Nov. 17, 2021), https://public.powerdms.com/LADCFS/tree/documents/402846.
[83] Scottie Hunter, *I-TEAM: DCFS brings facility online to prevent housing kids in hotels*, WAFB.COM (Jan. 4, 2024, 7:25 p.m.), https://www.wafb.com/2024/01/04/i-team-dcfs-brings-facility-online-prevent-housing-kids-hotels/
[84] Lex Talamo, *WATCHDOG: Louisiana children sent out of state for psychiatric care*, SHREVEPORTTIMES.COM (Oct. 1, 2016, 4:06 p.m.) at 3, https://www.shreveporttimes.com/story/news/2016/10/01/watchdog-louisiana-children-sent-out-state-psychiatric-care/85994498/.

available in state, they are placed in out-of-state facilities. Even children who are not sent out of state are placed outside of their communities, far from their school system, family, and friends, which severs necessary social ties.[85]

198. Upon information and belief, DCFS often does not have foster homes or family-like placements available for children entering care, and therefore, places these children in hotels, hospitals, DCFS offices, and juvenile detention facilities, despite these placements being sorely inappropriate for the children. As exemplified by the named Plaintiffs' experiences, DCFS often leaves foster children in these inappropriate placements for months.

199. According to recent news media reports, since March of 2023, approximately 150 foster children had 1,876 hotel stays.[86] When DCFS places children in hotels, the children are often isolated and go without the presence of a caring adult, merely watched by caseworkers or security guards who rotate throughout their shifts. Children placed in these settings do not have consistent access to school, healthcare services, or mental health services.

200. Many of the hospitals and institutions that Louisiana places children in are overly-restrictive and ill-suited for the needs of the child, as the named Plaintiffs' experiences show. Moreover, abuse, neglect, and maltreatment occur in these facilities. For example, Northlake Behavioral Health Hospital, where both Amelia and Mikaela were placed, lost its accreditation in 2022, and in March 2023, a federal agency identified it as under "red alert status" due to having "placed the health and safety of recipients in its care at risk for serious injury, serious harm, serious

---

[85] Brittany Breeding, *Children in foster cares in Louisiana greatly outnumber certified foster parents.* KTBS, TV, KTBS.COM. (Oct. 5, 2023), https://www.ktbs.com/news/arklatex-indepth/children-in-foster-care-in-louisiana-greatly-outnumber-certified-foster-parents/article_2b94e93e-63b5-11ee-91eb-ef99fec9b520.html.

[86] Scottie Hunter, *I-TEAM: DCFS brings facility online to prevent housing kids in hotels*, WAFB.COM (Jan. 4, 2024, 7:25 p.m.), https://www.wafb.com/2024/01/04/i-team-dcfs-brings-facility-online-prevent-housing-kids-hotels/.

impairment or death."[87] And the facility where Jacob, Alan, Daniel, and Jackson were placed by DCFS has a reputation among advocates in the state as an unsafe placement for children where sexual assaults are common. And Jacob, in fact, contracted a sexually transmitted infection after being sexually assaulted at that facility.

201.    While at these and other facilities, foster children receive no educational services, are often over-medicated, and are unable to maintain contact with their families and communities. And even in facilities where some educational services are technically provided, such as Pinecrest, foster children often do not receive the quality and consistency of services that they require. At Pinecrest, for example, 90% of students scored below the proficient level for math and reading in the 2020-2021 school year.[88] Moreover, placement instability and DCFS's frequent placement moves creates disruption in any educational services that children might be receiving.

202.    In addition to the high risk of abuse and neglect that children face in DCFS's institutional placements, children are at risk of abuse and neglect, and are often abused and neglected, in foster homes under DCFS's supervision. Upon information and belief, DCFS fails to adequately vet foster homes in the licensing process and to investigate reports of abuse and neglect in licensed foster homes and facilities where they place foster children.

    iii.    *Louisiana's Foster Children Experience Maltreatment in DCFS Custody.*

203.    Louisiana does not provide complete data on maltreatment rates in foster care due to data quality issues, including that DCFS's current data collection methods fail to capture the

---

[87] Alex Lubbe, *Federal reports describe dire conditions at psychiatric hospital in Mandeville*, NOLA.COM (Dec. 15, 2023), https://www.nola.com/news/northshore/federal-reports-show-dire-conditions-at-mandeville-hospital-northlake/article_c8a183a8-9b6f-11ee-a7a2-5774035c855f.html.

[88] *Pinecrest Supports & Services Center*, U.S. NEWS, https://www.usnews.com/education/k12/louisiana/pinecrest-supports-services-center-142920 (last visited Mar. 4, 2024).

perpetrator's relationships to child victims. But according to an investigation by the Advocate, "vulnerable children across Louisiana die at a rate that's 50% higher than the national average."[89]

204.    The available information shows that Louisiana's foster children are maltreated in care, with several especially egregious cases highlighted by news media in recent years. For example, in 2021, a Louisiana foster parent was accused of sexually assaulting a child in foster care.[90] The foster child tried to get help for nearly a decade—starting when she was six years old.[91] Media outlets reported that DCFS received several reports from mandated reporters, but there was "no evidence any of those reports were followed up on."

205.    In August 2022, another Louisiana foster parent was accused of sexually assaulting his foster children.[92] DCFS had previously removed one of the children from the foster father before returning the child to his care. The child, a 14-year-old boy, later told police that he had been raped "many times." Another 15-year-old child in the home said that he was forced to drink alcohol and then perform oral sex while he felt "drunk." Other foster children living in the home included a child with severe autism and mental health disorders who similarly claimed that he had been molested. News reports also showed that the home of the foster father was in disrepair and unsafe.

---

[89]  Andrea Gallo, *Special report: Suffering So Young in Louisiana*, NOLA.COM (Sept. 23, 2022), https://www.nola.com/news/suffering-so-young/collection_37ff73fc-1ff9-11ed-b105-374f67d3050f.html.

[90] WBRZ Staff, *Trial set to start Tuesday for alleged rapist accused of abusing child in foster care*, (July 10, 2023, 11:09 a.m.), https://www.wbrz.com/news/trial-set-to-start-tuesday-for-alleged-rapist-accused-of-abusing-child-in-foster-care.

[91] Austin Kemker, *After years of abuse, caretaker says DCFS/law enforcement 'dropped the ball' in protecting children*, WAFB (Nov. 22, 2021, 8:16 p.m.), https://www.wafb.com/2021/11/23/after-years-abuse-caretaker-says-dcfslaw-enforcement-dropped-ball-protecting-children/.

[92] Trey Schmaltz, *Kids raped by foster parent, deputies say in shocking arrest: DCFS at center of new controversy*, WBRZ (Aug. 5, 2022, 11:24 a.m.), https://www.wbrz.com/news/kids-raped-by-foster-parent-deputies-say-in-shocking-arrest-dcfs-at-center-of-new-controversy/.

206.    The named Plaintiffs have also experienced abuse and neglect while in DCFS's custody. For example, Jacob was sexually assaulted while at a facility in which he had been placed by DCFS, but DCFS did not remove him until several months after the assault. Amelia's medical condition deteriorated while in DCFS's care due to DCFS's failure to ensure that her caregivers were providing her with a PKU-compliant diet. Both Joseph and Jacob were placed in solitary conditions while inappropriately institutionalized by DCFS. And as mentioned above, multiple named Plaintiffs were placed in facilities that are unsafe and dangerous. Justine, Daniel, and Carter were physically abused or neglected while in foster care placements, and DCFS tried to place Alan in his father's custody despite that his father had previously abused him. DCFS did in fact place Justine with her mother despite her brother, who she had accused of sexual abuse, still living there. Additionally, the named Plaintiffs have suffered psychological and emotional abuse due to DCFS's policies and practices of over-institutionalization, inadequate placement array, high caseloads and understaffing, inadequate case planning, and a lack of adequate services.

207.    The fact that Louisiana children, including foster children, are in unsafe homes and placements is further illustrated by the findings of the 2018 Child and Family Services Review and subsequent Program Improvement Plan, which was developed to address issues identified in the CFSR. For example, on one metric—whether DCFS made efforts to assess and address the risk and safety concerns relating to the children in their homes or while in foster care—Louisiana was at 13.8% in 2018. While the state has improved, they are now at only 51.4%. With regard to this metric, the 2019 Program Improvement Plan[93] notes that the concerns include: "[n]o risk and safety

---

[93] The PIP "is a state-specific plan that addresses the practice and systemic concerns found during" the Children's Bureau's Child and Family Services Reviews ("CFSR") "that affect the system's ability to meet the needs of children

assessments at critical points of the case; Incorrect risk and safety assessments; Leaving children, paramours and fathers out of risk and safety assessments; Service delays and lack of follow up; Lack of contact and lack of quality contact with the family; and Poor and ineffective safety plans."[94]

208.    Moreover, DCFS's failure to address maltreatment can be inferred by its failure to investigate allegations of abuse and neglect of children not in the custody of DCFS. As discussed above, in June 2022, two-year-old Mitchell Robinson III died from a fentanyl overdose in Baton Rouge. Before Mitchell's death, after DCFS failed to investigate three prior reports from his healthcare providers warning that he had been hospitalized from overdosing on fentanyl and asking DCFS to intervene. An investigation from the Office of the State Inspector General reported that DCFS received several reports that were screened out and not accepted for investigation after Mitchell was previously hospitalized.[95] When the case was eventually screened in, it was assigned to a case worker who was overburdened with a high case load and out on sick leave. She did not investigate the allegations for a full week in which time Mitchell died.

209.    And DCFS received, but did not act on, several reports from a neighbor who was worried about the screams she kept hearing from Ezekiel Henry and his siblings, after which Henry was found dead in a trash can.

---

[94] Administration for Children and Families, *Child and Family Services Reviews: Guiding Principles, Framework, and Tools for the Program Improvement Plan Development Process*, https://public.huddle.com/b/DPovqP/index.html.

[94] Administration for Children and Families, *Louisiana Child and Family Services Review Program Improvement Plan Round 3* (May 24, 2019), https://www.acf.hhs.gov/sites/default/files/documents/cb/la-cfsr-r3-pip.pdf.

[95] Andrea Gallo, *New investigation explains how Louisiana DCFS failed to 'get this kid somewhere safe'*, The Advocate.com (Mar. 18, 2024), https://www.theadvocate.com/baton_rouge/news/new-report-shows-louisiana-failed-to-prevent-toddlers-death/article_397375aa-e53a-11ee-adca-0bd3f56b31b6.html.

210.    In response to the reported incidents of child abuse and deaths, Representative Jason Hughes issued a letter to former Governor Edwards in August 2022 stating that "[t]he problems at DCFS are too many to name, and too many children and families in our State are needlessly suffering. Money alone will not solve the issues at DCFS. The culture and structure at DCFS needs to change. We cannot wait any longer and time is not on our side." Representative Hughes has also stated that "The question we have to ask ourselves is how many more lives do we have to lose and how many more children have to be heinously raped."[96]

### C.    DCFS Inadequately Trains Its Caseworkers and Supervisors.

211.    DCFS still suffers from inadequate training of new caseworkers and their supervisors.

212.    To begin with, DCFS appears to impose no training requirements before a caseworker can take on a case.

213.    Upon information and belief, DCFS cannot improve its attrition rate until it overhauls its system for training caseworkers and properly selecting and training its supervisors.[97] Presumably due to budget shortfalls, DCFS cannot reward caseworkers who distinguish themselves with raises or bonuses, so the agency promotes these caseworkers to supervisors instead. This means that the most talented caseworkers get promoted out of the field, leading to far fewer caseworkers who are available to perform necessary work such as visiting children and families. Notably, as of June 2023, there appeared to be a nearly one-to-one ratio between supervisors and caseworkers.

---

[96] Scottie Hunter, "THE INVESTIGATORS: Lawmaker calls on governor to make leadership change within DCFS, 9News.com (Aug. 11, 2022), https://www.wafb.com/2022/08/12/investigators-lawmaker-calls-governor-make-leadership-change-within-dcfs/.

214.    A majority of managers lack the necessary experience to train their teams. According to the state's own estimates, 56% of supervisors and 63% of managers have three years of experience or less in their roles.[98] Upon information and belief, those who are promoted to supervisor do not necessarily have managerial skills, and they receive very little relevant training for that role. The skill set of an exceptional caseworker does not necessarily translate to being a supervisor. This has contributed to a toxic work environment, where supervisors engage in favoritism towards caseworkers who they like, while exhibiting petty and vindictive attitudes towards caseworkers who they do not like. Further, the current DCFS training materials provided to supervisors do not address management skills. The "Supervisor Support Training" is merely caseworker training with a different name.

215.    Although caseworkers formerly received six or twelve months of supervised field training (during which they performed their duties under the close supervision of an experienced team member), DCFS eliminated that requirement. Now, a new caseworker may be accompanied by a supervisor on six visits or less, and then they are on their own. In addition to inadequate training, new caseworkers are often traumatized by the conditions to which they are exposed with inadequate psychological and emotional support.

216.    Upon information and belief, this lack of supervised training and support contributes to the high rate of caseworker attrition. DCFS no longer invests in the six months of supervised field training because most new caseworkers do not stay for more than eighteen months. As a cause and effect, upon information and belief, these caseworkers are quitting early in their tenure in part because DCFS does not provide them with appropriate field training.

---

[98] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 569-70.

217.    Additionally, on information and belief, due to staffing shortages, caseworkers are often assigned tasks for which they have not been properly trained. For example, DCFS has tasked its caseworkers with removing children from a home, a complicated and sometimes dangerous task, without completing the relevant training.

**D.    DCFS's Inadequate Provision of Essential Services Harms Louisiana's Foster Children.**

218.    Children in foster care, along with their families, need adequate services so that they can be successfully reunified with their families or placed in another permanent family.

219.    Foster children who do not receive necessary services experience behavioral problems, which lead to those children being placed in a greater number of placements, thereby causing permanent damage to the child.

220.    DCFS has long been aware of issues with the provision of services. Indeed, the 2016 Transition Report noted that a 2014 Legislative Auditor Report found that "caseworkers did not have access to a complete array of services needed by their clients because they are not offered by DCFS" and that this problem had not been sufficiently rectified.[99]  Similarly, a 2016 consultant report on the Louisiana child welfare system noted that "[s]ubstance abuse services and high quality mental health services were often mentioned as insufficient."[100]

221.    Additionally, DCFS's 2016 internal Continuous Quality Improvement review identified issues with 69 (46%) of 150 cases in the area of assessing and meeting foster children's

---

[99] COMM. ON CHILDREN & FAMILY SERV. MEMBERS, ONWARD LOUISIANA, TRANSITION COMMITTEE ON CHILDREN AND FAMILY SERVICES 9-10, 13 (Jan. 21, 2016), https://gov.louisiana.gov/assets/docs/TransitionTeam/DCFS_Transition_Final_Report.pdf.
[100] The Child Welfare Policy & Practice Group, *A Review of Child Welfare The Louisiana Dept. of Children & Family Services* 46 (Jan. 5, 2016), https://www.dcfs.louisiana.gov/assets/docs/searchable/Child%20Welfare/PlansReports/Louisiana%20Child%20Welfare%20Report.pdf.

physical health needs. The report noted that "[r]eviewers found caseworkers failed to assess and provide appropriate and timely physical and dental care" that there was "missing documentation of medical exams" and a "lack of evidence of appropriate oversight of prescription medicine."

222.    A 2017 Legislative Auditor Report further noted that children who entered foster care were not receiving timely medical visits. Specifically, of the 2,808 children who entered foster care in 2016, 1,077 (28.4%) did not receive an initial medical visit within seven days, as required by DCFS policy and on average the initial medical visit took 32 days.

223.    With regard to mental health, the 2017 Legislative Auditor Report found that "DCFS management does not have an efficient method to ensure that caseworkers are conducting initial behavioral health assessments of foster children and coordinating services for those children with identified behavioral health needs." This was due in part to the fact that DCFS has no documentation of whether there were behavioral health assessments for 63% of children. The auditors found that 6.7% of the children who entered foster care in 2016 had not received behavioral health services by the end of the year and 9% of the children who entered as a result of sexual abuse had not received behavioral health services.

224.    DCFS's internal Continuous Quality Improvement review identified issues with 29 (25.2%) of 115 cases in the area of assessing and providing behavioral health services for children. For example, some case files showed caseworkers "did not conduct assessments to determine behavioral health needs" and contained no evidence to support diagnoses like ADHD. "In more severe cases, a child did not receive counseling for sexual abuse despite exhibiting sexually inappropriate behavior, and a child who was diagnosed with depression had no follow up services for more than 5 months."

225.    This failure to provide services is ongoing. In its 2022 Annual Progress and Services Report, DCFS reported that it was only at 50% on the metric asking whether DCFS made concerted efforts to assess the needs of and provide services for children, parents and foster parents (Case Review Item 12). The 2019 Program Improvement Plan noted that the poor scoring was due to "insufficient needs assessments, services not provided to meet parent's needs or services identified but not provided." The 2019 PIP further noted that the factors leading to the poor rating were "insufficient engagement with fathers, lack of concerted efforts to locate parents, and quality of the *visits were insufficient to assess needs or deliver appropriate services.*"[101]

226.    Similarly, a December 2022 Legislative Auditor Report on Child Welfare Job Satisfaction noted that caseworkers were "concerned that high caseloads and limited resources prevent them from providing quality services to children and families."[102]

227.    While DCFS has improved somewhat on Case Review Item 12 in recent years, it was still only at 43.1% for performance as of the April 1, 2022 to September 30, 2022 time frame as reported in its 2024 Annual Progress and Services Report. As exemplified by the stories of the named Plaintiffs, DCFS has continued to fail to provide quality services consistently to children, including much needed counseling services. This lack of consistent services and quality services sets up foster children for failure and also, as discussed above, leads to placement instability.

228.    One issue leading to the failure to provide adequate services is that foster children are often not assessed adequately for various mental health needs and thus are not assigned

---

[101] Administration for Children and Families, *Louisiana Child and Family Services Review Program Improvement Plan Round 3* (May 24, 2019), https://www.acf.hhs.gov/sites/default/files/documents/cb/la-cfsr-r3-pip.pdf.
[102] La. Dep't of Children & Family Servs., *Child Welfare Job Satisfaction Survey*, Louisiana Legislative Auditors (issued Dec. 1, 2022) at 3, https://app.lla.state.la.us/publicreports.nsf/0/d30ce8b327892bb38625890b007621e0/$file/0000039eb.pdf?openelement&.7773098.

required services. Although DCFS requires that an initial assessment be performed of every child in care to determine the child's need for counseling or therapy, upon information and belief, these assessments amount to nothing more than "checking a box" and consist of only a short questionnaire. In addition, DCFS will often only provide therapy in a group setting to children with acute trauma who require individualized care. Therapists will offer handouts or worksheets to children who have deep-seated issues, rather than meaningfully engage with them through the talk therapy that they need. And, upon information and belief, many facilities are overly reliant on psychotropic medications, which frequently results in children being overmedicated, including for disorders that they may not have. Many of the named Plaintiffs have been prescribed psychotropic medications that are altered and adjusted with each placement move and, like Mikaela, are not informed of why they are being prescribed the medications.

229.    Foster care children face significant delays in receiving services. They often spend weeks in a new foster home before they can go to school. That length of time may turn to months, or even years, for children sent to an institutional setting, as several named Plaintiffs experienced. And it can take months to get any therapy, mental health care, or medical care.

230.    And because many services in Louisiana are limited, especially in more rural areas, foster children often have to travel long distances to other parts of the state in order to obtain them. For instance, children with autism have few options for services, and children who have been exposed to extreme sexual abuse and trauma have effectively no access to adequate services for sexual abuse treatment.

231.    This lack of services combined with a lack of therapeutic foster homes often leads to DCFS placing foster children in institutions unnecessarily, as shown by the experiences of the

named Plaintiffs. Although DCFS policy states that the "[p]lacement of children in residential facilities is [a] care setting of last resort and is considered an interim, short term setting,"[103] DCFS often improperly leaves children in these placements for several months at a time because it does not have a sufficient number of appropriate non-institutional placements. Additionally, upon information and belief, DCFS often violates its own policy by failing to review these children's cases at least every fourteen days.[104]

232.    Additionally, there are only a few hospitals in Louisiana equipped to handle children with extensive needs, and these hospitals often have maxed out capacity.[105] When these hospitals cannot accept more children, the children are often placed in facilities far away from their families.

233.    The same inadequacies plague the availability of services for parents and caregivers. DCFS maintains an inadequate service array to address the needs of both biological and foster parents. As a result, permanency is delayed and children are removed from placements where they might otherwise have thrived had the adult been provided with the services needed to care for the child. And often times, DCFS makes insufficient efforts to provide parents and caregivers with these services, even if they do exist. The stories of the named Plaintiffs and their caregivers exemplify these problems.

---

[103] La. Dep't of Children & Family Servs., *Child Welfare-6-555 – Residential Facilities*, (eff. Nov. 1, 2020), https://public.powerdms.com/LADCFS/tree/documents/404782.
[104] La. Dep't of Children & Family Servs., *Child Welfare-6-555 – Residential Facilities*, (eff. Nov. 1, 2020), https://public.powerdms.com/LADCFS/tree/documents/404782.
[105] Lex Talamo, *Watchdog Children's mental health services shortage puts them at risk,* SHREVEPORTTIMES.COM (Jan. 2, 2016, 4:06 p.m.), https://www.shreveporttimes.com/story/news/2016/01/02/childrens-mental-health-services-shortage-puts-children-risk/77697114/.

234.    DCFS often requires that parents participate in parenting classes as part of a case plan and refers them to a program run out of Tulane University. The program, however, requires an intake, several weeks of trauma-based relationship training in a group setting, and an assessment before the parenting education begins. There is almost always a long waitlist. In practice, therefore, it takes parents several months to even begin taking these classes, setting them up to fail when their DCFS case plans demand they complete classes by a certain date.

235.    DCFS often requires parents to participate in substance-use programs, but there is a significant shortage of these programs and those that are available often span less than one month and so are too short to effect meaningful change. Another common requirement to regain custody is for the parents to maintain a "safe and stable" living environment. DCFS does little to assist parents in this area, however, often doing nothing more than providing parents with a list of housing resources that often have long wait lists and may ultimately be unaffordable.

**E.    DCFS's Inadequate Case Plans, Inadequate Case Review Systems, and Non-Existent Comprehensive Child Welfare Information System Harm Louisiana's Foster Children.**

*i.    DCFS's Failure to Case Plan and Review Cases Puts Children at Risk and Prolongs Their Time in Foster Care.*

236.    DFCS continues to perform abysmally at developing adequate case plans and performing timely and adequate case reviews.

237.    DCFS's 2024 Annual Progress and Service Report revealed that initial case plans were not timely completed in 26.25% of the cases surveyed from July 1, 2022, to June 30, 2022, and that ongoing case plans were not timely completed in 18.68% of cases surveyed during that

same period.[106] That same report noted that the biological parents were only providing input for the initial case plan in 25% of the cases surveyed and in only 42.3% of the ongoing case plans surveyed.[107]

238.    The most recent Child Family Services Review echoed these concerns. It identified a need for DCFS to "effectively engag[e] families during the quality caseworker visits and case planning activities."[108] According to that Review, DCFS's "lack of parental engagement significantly affected performance in well-being items related to case planning, caseworker visits, and service needs assessment and provision." And DCFS's "[i]nsufficient contact with parents adversely affected the achievement of case plan goals and permanency for children in foster care." While DCFS policy requires them to conduct family team meetings with the child's parents present, DCFS often schedules these meetings without consulting the parents or their attorneys in advance. And even when parents are given the opportunity to participate, DCFS often approaches the meeting with a checklist of "non-negotiables" and fails to meaningfully consider the parents' perspectives.

239.    DCFS claims that "[a]ll case plan review meetings and court case hearings continue to be entered into [the 'TIPS' database],"[109] but DCFS does not publicly report what percentage of foster care cases comply with AACWA's requirement that case reviews be performed by a court or administrative hearing officer at least every six months. Upon information and belief, DCFS no longer publicly reports this data because it shows that DCFS is consistently failing to ensure that case reviews are performed at least every six months.

---

[106] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 85.
[107] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 85.
[108] Administration for Children and Families, *Final Report: Louisiana Child and Family Services Review*, at 6 (2018).
[109] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 87.

240.    DCFS also fails to perform essential tasks in connection with case plans and case reviews. For instance, a "transfer staffing" should occur in every case in which a child is transferred from child protective services to foster care, and whenever a child is transferred from one foster care caseworker to another. Among other things, this helps the caseworker understand the child and family's background, what led to that child being placed in foster care, and what services the child needs.

241.    DCFS has experienced "difficulty in ensuring quality and timely case transfer from investigations to Foster Care."[110] According to the 2024 Annual Service Report, DCFS conducted "timely and quality" transfer staffings in only 16% of the cases surveyed from January 1, 2021 to September 30, 2021, and 33.3% of the cases surveyed from October 1, 2021 to June 30, 2022.

242.    DCFS foster care caseworkers are also required to perform an initial Structured Decision Making Risk Assessment in every case.[111] This assessment is performed at the parent's home where the abuse or neglect that led to removal occurred. It "is the process used to determine the degree to which the child may be at risk of future maltreatment [over] the next 18-24 months."[112] And it "determines if a family is more or less likely to have another incident without further intervention by the Department."

243.    According to the 2024 Annual Progress and Service Report, DCFS only conducted risk assessments in 20.7% of the cases surveyed from January 22, 2020 to March 31, 2020, 48%

---

[110] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 246.
[111] La. Dep't of Children & Family Servs., *Child Welfare-6-202 – Risk Assessment and Reassessment,* (eff. Apr. 1, 2020), https://public.powerdms.com/LADCFS/tree/documents/403036.
[112] La. Dep't of Children & Family Servs., *Child Welfare-6-202 – Risk Assessment and Reassessment,* (eff. Apr. 1, 2020), https://public.powerdms.com/LADCFS/tree/documents/403036.

of the cases surveyed from January 1, 2021 to September 30, 2021, and 40% of the cases surveyed from January 1, 2022 to September 30, 2022.[113]

244.    The most recent Child Family Services Report, likewise, noted significant deficiencies in DCFS's risk assessments. According to that report, DCFS "did not consistently conduct comprehensive risk and safety assessments for both in-home and foster care cases," and suffered from "limited parent and family engagement to assessment and support families in obtaining services related to identified safety concerns." [114]

245.    Within 90 days after a foster care case is opened and every 90 days thereafter, a caseworker must complete a Structured Decision Making Out-Of-Home Reunification Reassessment.[115] According to the 2024 Annual Progress and Service Report, DCFS only conducted a Reunification Reassessment in 41.4% of cases surveyed from January 22, 2020 to March 31, 2020, and 24% of cases surveyed from January 1, 2021 to September 30, 2021.[116]

       *ii.    DCFS Lacks an Adequate Information System to Track Child Welfare.*

246.    DCFS currently lacks a comprehensive child welfare information system, which is crucial to ensuring the safety and well-being of children in foster care.

247.    Instead, DCFS uses a hodgepodge of nearly a dozen legacy systems that, upon information and belief, contain redundant and inconsistent information—including: (i) the Tracking Information and Payment System, (ii) the Louisiana Adoption Resource Exchange, (iii) ACESS 2.0, (iv) Family Assessment Tracking System, (v) Interstate Compact for the Placement

---

[113] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 246.
[114] *Administration for Children and Families, Final Report: Louisiana Child and Family Services Review*, at 4 (2018).
[115] La. Dep't of Children & Family Servs., *Child Welfare-6-202 – Risk Assessment and Reassessment,* (eff. Apr. 1, 2020), https://public.powerdms.com/LADCFS/tree/documents/403036.
[116] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 246.

of Children Database, (vi) Family Resource Center Database, (vii) National Youth in Transition Database, (viii) Quality Assurance Tracking System, (ix) Trauma Based Health tool, and (x) Child Abuse Neglect System.

248.    In 2019, DCFS was awarded $40 million in state and federal funds to rebuild the IT system that tracks the welfare of children in foster care.[117] At the time, DCFS stated that it was creating an information system called "Unify" to "modernize outdated legacy systems that currently support child welfare programs" and replace the databases identified above.[118] Unify was supposed to "go-live" in the first quarter of 2023.

249.    But the contract was pulled after DCFS had already paid a third-party vendor $13 million for the system.[119] DCFS reported that "[a]ll work on the previous CCWIS program project ended in November 2022 with the cancellation of [the third-party vendor's] contract for convenience." No replacement vendor "has been selected."[120] DCFS now claims that its "current legacy statewide information is functioning well."

250.    DCFS's lack of adequate technology for child welfare purposes has been a longstanding issue. Indeed, the 2016 Transition Report noted that the then-current case management software "does not offer child welfare staff the systems needed to accurately and

---

[117] Ariel Salk, *Lawmakers want to know what happened to $40M for upgrades to DCFS*, brproud (Apr. 4, 2023, 9:06 p.m.), https://www.brproud.com/news/lawmakers-want-to-know-what-happened-to-40m-for-upgrades-to-dcfs/; Scottie Hunter, *Millions of dollars worth of technology upgrades at DCFS delayed until 2024*, WAFB (Aug. 10, 2022, 7:30 p.m.), https://www.wafb.com/2022/08/10/investigators-millions-dollars-worth-technology-upgrades-dcfs-delayed-until-2024/.
[118] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 78.
[119] Ariel Salk, *Lawmakers want to know what happened to $40M for upgrades to DCFS*, brproud (Apr. 4, 2023, 9:06 p.m.), https://www.brproud.com/news/lawmakers-want-to-know-what-happened-to-40m-for-upgrades-to-dcfs/?utm_medium=email&utm_source=govdelivery.
[120] La. Dep't of Children & Family Servs., *2024 Annual Progress and Service Report* at 81.

efficiently capture data on child abuse and neglect."[121] The 2016 report by the Child Welfare Policy and Practice Group noted that in "[a] major source of local frustration [among caseworkers] is the Department's inefficient and obsolete case management information system."[122]

251.    Similarly, a 2016 report by the Child Welfare Policy & Practice Group, a DCFS consultant, found that "[a]lmost universally DCFS front-line staff complained about the inefficiencies of the Department's outdated automated systems which necessitate duplicate data entries and re-entry of data. Additional lost time occurs when the system is down." The Child Welfare Policy & Practice Group further reported that "DCFS is well-aware of the inefficiencies of its current information systems and states that it has undertaken modernization efforts."

252.    Additionally, the 2017 Legislative Auditor Report noted that "DCFS management does not have accurate or complete data to sufficiently oversee the foster care program."[123] The report found that 63% of children who entered foster care during 2016 (1,918 of 3,043 children) had no documentation of required initial behavioral health assessment. Other issues with the computer system that "impact[ed] data and accuracy completeness" included "underreported data elements, such as diagnosed disability information, incomplete data elements, such as medical visits, and incorrect data elements, such as placement dates."

253.    Without a comprehensive child welfare information system, it is impossible for DCFS to adequately perform case reviews or risk assessments; track how frequently its

---

[121] COMM. ON CHILDREN & FAMILY SERVS. MEMBERS, ONWARD LOUISIANA, TRANSITION COMMITTEE ON CHILDREN AND FAMILY SERVICES 14 (JAN. 21, 2016), https://www.gov.louisiana.gov/assets/docs/TransitionTeam/DCFS_Transition_Final_Report.pdf.

[122] The Child Welfare Policy & Practice Group, *A Review of Child Welfare The Louisiana Dept. of Children & Family Services* 7 (Jan. 5, 2016), https://www.dcfs.louisiana.gov/assets/docs/searchable/Child%20Welfare/PlansReports/Louisiana%20Child%20Welfare%20Report.pdf.

[123] LOUISIANA LEGISLATIVE AUDITOR, DEP'T OF CHILDREN & FAMILY SERVS., OVERSIGHT OF THE FOSTER CARE PROGRAM 3 (Aug. 9, 2017).

caseworkers are making visits, conducting assessments, or reviewing cases; know what case plans are being entered; or track what is happening to the children in the foster care system. Moreover, DCFS's failure to construct a functioning information system amounts to deliberate indifference on the part of its officials to the shortcomings within the state's child welfare system. Reviewing and tracking data on how the system is functioning is necessary for DCFS to make meaningful improvements and prevent children from suffering a risk of substantial harm.

## CLASS ACTION ALLEGATIONS

254.    This action is proper as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

255.    This action consists of one major class and one subclass:

a)    All children for whom DCFS has or will have legal responsibility and who are or will be in the legal and physical custody of DCFS (the "General Class"); and

b)    All children who are in foster care, who have physical, cognitive, or psychiatric disabilities, and who are currently placed in a psychiatric residential treatment facility, a therapeutic group home, a non-medical group home, or an acute care hospital (the "ADA Subclass").

256.    Each class is numerous enough to make joinder impracticable:

a)    The General Class consists of at least 4,346 children who currently are in or will enter Defendants' custody; and

b)    The ADA Subclass consists of thousands of children with disabilities who are already in or will enter Defendants' custody.

257.    The questions of fact and law that Plaintiffs raise are common to and typical of those of each putative member of the General Class and subclass whom they seek to represent.

258.    The named Plaintiffs rely on Defendants for foster care services in Louisiana and wholly depend on them for the provision of those services.

259.    Defendants' long-standing and well-documented actions and inactions substantially depart from accepted professional judgment and constitute deliberate indifference to the harm to Plaintiffs, the risk of harm to Plaintiffs, and violations of Plaintiffs' legal rights, as well as those of the General Class and ADA Subclass they represent.

260.    Common questions of fact to the General Class and ADA Subclass include:

a)    whether Defendants fail to protect the General Class and ADA Subclass from physical and severe psychological harm, and the risk of physical and psychological harm;

b)    whether Defendants operate a system that promptly and adequately assesses the individual needs of members of the General Class and ADA Subclass;

c)    whether Defendants operate a system that adequately plans placements, treatment, and supports appropriate to the individual needs of the members of the General Class and ADA Subclass;

d)    whether Defendants operate a system that provides an adequate number and diversity of placements to permit the members of the General Class and ADA Subclass to reside in the least restrictive, and most family-like environment;

e)    whether Defendants provide adequate caseworker resources and training to ensure that members of the General Class and ADA Subclass routinely meet with caseworkers face-to-face, receive individualized case plans, and receive all necessary services to enable the General Class and ADA Subclass to avoid harm and the risk of harm;

f)    whether Defendants take necessary steps to initiate termination of parental rights proceedings for all children who have been in foster care for 15 out of the last 22 months, unless there is a compelling reason why that would not be in the children's best interests as documented in the record or the child is eligible for a statutory exception;

g)      whether Defendants deprive members of the General Class and ADA Subclass necessary and appropriate services to ensure that they have access to home- and community-based placements; and

h)      whether Defendants deprive members of the General Class and ADA Subclass home- and community-based placements in the least restrictive, integrated setting appropriate to their needs.

261.    Common questions of law to the General Class and ADA Subclass include:

a)      whether Defendants' systemic failures, policies, and practices violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including by exposing Plaintiffs to further neglect, abuse, trauma, and deterioration, and to a substantial risk of the same, by subjecting them to unnecessary and frequent placement moves, harmful and inadequate placements, lack of necessary services and education, unnecessary institutionalization, and lack of permanency planning;

b)      whether Defendants acted with deliberate indifference toward Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

c)      whether Defendants' systemic failures, policies, and practices substantially departed from accepted professional judgment, practice, or standards in violation of Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

d)      whether Defendants' systemic failures, policies, and practices violate Plaintiffs' rights to obtain a permanent home and family under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

e)      whether Defendants' systemic failures, policies, and practices violate Plaintiffs' rights under AACWA, as amended by the Adoption and Safe Families Act of 1997, including their right to (i) a comprehensive written case plan, (ii) a case review system ensuring those case plans are in place and are updated, and (iii) permanency by seeking the termination of parental rights after they have been in custody for 15 out of the last 22 months, subject to certain exceptions;

    f)    whether Defendants' systemic failures, policies, and practices violate the ADA Subclass's rights under: (i) Title II of the ADA, 42 U.S.C. § 12131 *et seq.*; (ii) the Rehabilitation Act, 29 U.S.C. § 794; and (iii) all regulations issued to implement the above laws.

262.    The violations of law and resulting harms that Plaintiffs allege are typical of the legal violations and harms or risk of harm that all children in the General Class and ADA subclass experience.

263.    The named Plaintiffs will fairly protect the interests of the General Class and ADA Subclass that they seek to represent.

264.    Defendants have acted or failed to act on grounds generally applicable to all members of the General Class or, where appropriate, ADA Subclass, requiring class-wide declaratory and injunctive relief.

265.    Counsel for Plaintiffs know of no conflict among the class members.

266.    These attorneys, who are competent and experienced in class action litigation, child welfare litigation, and complex civil litigation, represent the named Plaintiffs:

    a)    **A Better Childhood, Inc.**  ABC is a nonprofit legal advocacy organization that has extensive experience with litigating federal child welfare cases and class actions throughout the United States. Its legal team includes Executive Director Marcia Lowry, Supervising Attorney Julia Tebor, Staff Attorney Lindsay Gus, and Staff Attorney David Baloche, and its lawyers have been appointed as Class Counsel in other class action lawsuits.

    b)    **Wheeler Trigg O'Donnell LLP.** Wheeler Trigg is a litigation boutique with over 110 litigators with extensive experience with litigation federal class actions throughout the United States. Its legal team includes Galen Bellamy, Allison McLaughlin, Kevin Homiak, Emily Linehan, and Iva Velickovic.

    c)    **Simon, Peragine, Smith & Redfearn, LLP.**  Simon, Peragine, Smith & Redfearn is a New Orleans-based law firm with over forty

years of practice in Louisiana, and its lawyers have been appointed as Class Counsel in other class action lawsuits. Its legal team includes Robert Redfearn, Windsor Richmond, and Kelly Gismondi.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**42 U.S.C. § 1983–Fourteenth Amendment to the U.S. Constitution Substantive Due Process (On Behalf of the General Class Against Defendants David Matlock and Jeffrey Landry)**

267.    Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

268.    A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to provide reasonable care to and to protect from harm a child with whom it has formed a special relationship, such as a child in the legal and/or physical foster care custody.

269.    The foregoing actions and omissions of Defendants constitute a policy, pattern, practice, or custom inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all the members of the General Class.

270.    Defendants are aware of the policies and practices that prevent these class members from receiving adequate protection from harm after the state has formed a special relationship with them and is deliberately indifferent to them.

271.    As a result, the named Plaintiffs and all the members of the General Class of children to whom the state owes a special duty, children in the legal and/or physical foster care custody, have been, and are, at risk of being deprived of substantive due process rights the United States Constitution confers.

272.    Having taken custody of Plaintiffs, DCFS assumed the responsibility to provide them constitutionally adequate care.

273.    These substantive due process rights include, but are not limited to:

a)    The right to personal security and reasonably safe living conditions;

b)    the right to be free from physical abuse;

c)    the right to be free from the risk of severe psychological abuse and emotional trauma;

d)    the right to avoid deteriorating physically or psychologically while in state institutions or state custody;

e)    the right to be free from persistent threats of bodily harm;

f)    the right to protection from unnecessary intrusions into the child's emotional wellbeing while in state custody;

g)    The right to services necessary to prevent unreasonable risk of harm;

h)    the right to conditions and duration of foster care that are reasonably related to the purpose of government custody; and

i)    the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody.

274.    That DCFS's myriad deficiencies place Louisiana's foster children at a substantial risk of harm which has been obvious for decades. These risks are longstanding, pervasive, well-documented, and expressly noted by DCFS in the past in both public statements by DCFS secretaries and in-state audit reports.

275.    Defendants are aware of systemic deficiencies with high turnover, high caseloads, poor supervision and training, high placement instability, and inadequate access to services and placements. They also know that these deficiencies pose a significant safety risk for foster children.

Despite this knowledge, Defendants have not taken reasonable steps to cure the problems. Indeed, it is not clear that they have taken any steps at all.

276.    Thus, Defendants are deliberately indifferent to a substantial risk of serious harm to the General Class as a result of its systemic deficiencies identified above, and that these deficiencies are a direct cause of the constitutional harm to Plaintiffs.

277.    Defendants' wholly inadequate response in the face of these problems is a violation of its duty to the children in its care.

<div align="center">

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983–First, Ninth, and Fourteenth Amendment Right to Family Association**
**(On Behalf of the General Class Against Defendants David Matlock and Jeff Landry)**

</div>

278.    Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

279.    A state assumes affirmative duties to provide reasonable efforts to obtain a permanent home and family derived from the First Amendment's right of association and right to a permanent family and the Ninth Amendment's reservation of rights to the people.

280.    Plaintiffs and the class members they represent are in Defendants' custody or guardianship and dependent on Defendants to provide for their basic physical, psychological, and emotional needs, and to protect them from physical, psychological, and emotional harm.

281.    Children frequently and foreseeably suffer physical, psychological, and emotional harm or the substantial risk of harm in DCFS custody. They suffer harm in part because, unlike the ideal of a stable and permanent home and family, they are continually shuttled between temporary and often non-familial custodial arrangements. Professional judgment and standards of

conduct require the Defendants to make reasonable efforts toward placing children in their care in stable, permanent families.

282.    In particular, Plaintiffs have a right to familial association with their biological parents.

283.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, or custom inconsistent with the exercise of professional judgment and amount to deliberate indifference to the constitutional rights of Plaintiffs and the members of the General Class.

284.    By failing to take all reasonable efforts toward fostering familial association and securing a permanent home and family for the named Plaintiffs and the class members they represent, Defendants have failed to protect them from physically, psychologically, and emotionally harmful circumstances.

285.    As a result, the named Plaintiffs and all the members of the General Class have been, are at risk of being, deprived of the right to familial association and reasonable protection from physical, psychological, and emotional harm while in Defendants' custody, in violation of the First Amendment's right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections.

### THIRD CAUSE OF ACTION
**42 U.S.C. § 1983–The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.*, as Amended by the Adoption and Safe Families Act of 1997 (On Behalf of the General Class Against All Defendants)**

286.    Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

287.    Federal law requires that the Plaintiffs have specific rights under the federal Adoption Assistance and Children Welfare Act of 1980 ("AACWA").

288.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, or custom of depriving the named Plaintiffs and the classes they represent of the rights in the Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997.

289.    Specifically, Defendants violated §§ 671(a)(16) and 675(1) of AACWA—which requires that DCFS provide a written "case plan" for each foster child that includes at least the following:

a)    A description of the type of home or institution in which a child is to be placed and a discussion of the safety and appropriateness of the placement[124];

b)    A plan for assuring that the child receives safe and proper care, and that services are provided to the biological parents, child, and foster parents to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan[125];

c)    The health and education records of the child[126];

d)    For a child who is 14 or older: (i) a written description of the programs and services which will help the child prepare for the transition from foster care to a successful adulthood;[127] (ii) a document that describes the child's rights with respect to education, health, visitation, and court participation;[128] and (iii) a signed acknowledgment by the child that they have been provided this

---

[124] 42 U.S.C. § 675(1)(A).
[125] *Id.* § 675(1)(B).
[126] *Id.* § 675(1)(C).
[127] *Id.* § 675(1)(D).
[128] *Id.* § 675a(b)(1).

document that the rights contained therein have been explained to them in an age-appropriate way[129];

e)    In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find a suitable placement[130];

f)    In the case of a child with respect to whom the permanency plan is placement with a relative, a description of the steps the agency has taken to determine that it is not appropriate for the child to be returned home or adopted, the reasons for any separation of siblings, and the reasons why a permanent placement with the relative is in the child's best interests[131]; and

g)    A plan for ensuring the educational stability of the child while in foster care[132].

290.    And Defendants violated §§ 671(a)(16) and 675(5) of AACWA—which requires that DCFS have a "case review system," which ensures that:

a)    Each foster child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available an in close proximity to their parents' home, consistent with the best interest and special needs of the child[133];

b)    If the child has been placed a substantial distance from the home of their parents, the case plan sets forth the reasons why such placement is in their best interests[134];

c)    If the child has been placed outside of the state in which their parents are located, the case plan requires that a caseworker visit the child at their placement at least every six months and submit a report for each visit[135];

d)    The status of each child is reviewed at least every six months by either a court or an administrative body to determine (i) the safety

---

[129] *Id.* § 675a(b)(2).
[130] *Id.* § 675(1)(E).
[131] *Id.* § 675(1)(F).
[132] *Id.* § 675(1)(G).
[133] 42 U.S.C. § 675(5)(A)
[134] *Id.* § 675(5)(A)(i).
[135] *Id.* § 675(5)(A)(ii).

of the child, (ii) the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, (iii) the extent of progress that has been made toward mitigating the causes that led to placement in care, and (iv) project a likely date by which the child may be returned to and safely maintained in the home or placed for adoption or legal guardianship[136]);

e)   For a child for whom another planned permanent living arrangement has been determined as the permanency plan, the steps the agency is taking to ensure the placement is following the reasonable and prudent parent standard and to ascertain whether the child has regular, ongoing opportunities to engage in age or developmentally appropriate activities[137]; and

f)   For each child in foster care for 15 of the most recent 22 months, DCFS (i) petition to terminate the parental rights of the child's parents, subject to statutory exceptions; and (ii) concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child[138].

291.   These provisions are intended to benefit Plaintiffs and the classes they represent; the rights conferred are neither vague nor amorphous such as to strain judicial competence, and the statute imposes a binding obligation on the states[139].

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 12131 *et seq.* – The Americans with Disabilities Act
### (On Behalf of the ADA Subclass Against All Defendants)

292.   Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

293.   Title II of the ADA, 42 U.S.C. 12131, *et seq.*, and its enabling regulations, 28 C.F.R. 35.101 *et seq.* (2022), prohibit public entities from excluding individuals with disabilities

---

[136] *Id.* § 675(5)(B
[137] *Id.*
[138] *Id.* § 675(5)(E).
[139] *See* 42 U.S.C. § 1983.

from participating in, or receiving the benefits of, services, programs or activities provided by the entity, or otherwise discriminating against individuals with disabilities because of their disability.

294.    Members of the ADA Subclass experience physical, cognitive, and psychiatric disabilities that qualify them as individuals with disabilities under the ADA. 42 U.S.C. § 12131(2).

295.    Defendants are public officials of a public entity subject to the ADA. 42 U.S.C. § 12131(1)(A)–(B).

296.    Under the regulations implementing the ADA, public entities may not "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."[140].

297.    Moreover, the ADA and its implementing regulations require the state to place individuals with disabilities in the most integrated community settings appropriate to their needs, rather than institutions.[141]

298.    By placing foster children with disabilities in institutions instead of foster homes in the community, Defendants have violated the ADA Subclass members' rights under *Olmstead* and the integration mandate of the ADA to placement in the least restrictive setting appropriate to their needs.[142]

299.    By maintaining an inadequate array of community-based services and therapeutic foster homes, Defendants have caused the ADA Subclass members to be institutionalized in

---

[140] 28 C.F.R. § 35.130(b)(1)(iii) (2022).
[141] 28 C.F.R. § 35.130(d) (2022); *see also* 42 U.S.C. § 12131; *Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999).
[142] 42 U.S.C. § 12131; 28 C.F.R. § 35.130(d) (2022); *Olmstead*, *supra*.

violation of their rights under *Olmstead* and the integration mandate of the ADA to placement in the least restrictive setting appropriate to their needs.[143]

300.    By engaging in the foregoing actions and inactions, the Defendants have discriminated against the members of the ADA Subclass based on their disabilities in violation of 42 U.S.C. § 12132.

301.    As a result of the Defendants' violations of the ADA, the ADA Subclass members are currently unnecessarily institutionalized, have suffered injuries from their institutionalization, and will suffer further injuries because of their ongoing institutionalization, unless Defendants are required to comply with applicable law.

<div align="center">

**FIFTH CAUSE OF ACTION**
**29 U.S.C. § 701 *et seq.* – The Rehabilitation Act**
**(On Behalf of the ADA Subclass Against All Defendants)**

</div>

302.    Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

303.    Like the ADA, the Rehabilitation Act and its implementing regulations prohibit entities receiving federal funding from excluding individuals with disabilities from participating in, receiving the benefits of, or otherwise discriminating against individuals on account of their disabilities.[144]

304.    The Rehabilitation Act and its implementing regulations likewise require covered entities to provide individuals with disabilities services in the most integrated setting appropriate to their needs and an equal opportunity to participate in or benefit from available services.[145]

---

[143] 42 U.S.C. § 12131; 28 C.F.R. § 35.130(d) (2022); *Olmstead*, *supra*.
[144] 29 U.S.C. § 794(a).
[145] 45 C.F.R. § 84.4(b)(2) (2022).

305.    Members of the ADA Subclass have physical, cognitive, and psychiatric disabilities that make them qualified individuals with disabilities under the Rehabilitation Act.[146]

306.    The Defendants receive substantial federal funding to operate the statewide foster care system, and DCFS's operations constitute a "program or activity" under the Rehabilitation Act.[147]

307.    For all the reasons set forth above, Defendants have violated the Rehabilitation Act by failing to provide foster children with disabilities an equal opportunity to participate in foster care services detailed above, including placement in the most home-like, least restrictive setting appropriate to their individual needs.

308.    As a result of Defendants' past and ongoing violations of the Rehabilitation Act, the ADA Subclass members have suffered injuries, are currently suffering injury, are currently institutionalized, and at risk of suffering further injuries, unless Defendants are required to comply with applicable law.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, the Plaintiffs request that this Honorable Court:

1.    Assert jurisdiction over this action;

2.    Order that Plaintiffs may maintain this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure and the undersigned counsel be appointed jointly as Class Counsel;

---

[146] 29 U.S.C. § 705(20).
[147] 29 U.S.C. § 794(a), (b)(1)(A).

3.      Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare

unconstitutional and unlawful:

      a)      Defendants' violation of Plaintiffs' right to be free from harm under the Fourteenth Amendment to the U.S. Constitution;

      b)      Defendants' violation of Plaintiffs' rights under the First, Ninth and Fourteenth Amendments to the U.S. Constitution;

      c)      Defendants' violation of Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.*, as amended by the Adoption and Safe Families Act of 1997; and

      d)      Defendants' violation of Plaintiffs' rights under Title II of the ADA, as amended, 42 U.S.C. § 12132 *et. seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

4.      Permanently enjoin Defendants from subjecting Plaintiffs to practices that violate

their rights, including:

      a)      Require Defendants to maintain caseloads for each case worker providing direct supervision and planning for children at accepted professional standards, as developed by either the Council on Accreditation and/or the Child Welfare League of America;

      b)      Require Defendants to recruit and retain enough qualified and appropriately trained workers providing direct supervision and planning for children, as set by the Council on Accreditation and/or Child Welfare League of America;

      c)      Require Defendants to place children in placements that are safe, appropriate, and in the least restrictive environment that best suits their individual needs;

      d)      Enjoin Defendants from placing any child in a congregate care setting based on the unavailability of foster home resources;

      e)      Require that Defendants ensure that all children who enter foster care placement receive within 30 days of entering care a comprehensive evaluation of the child's needs, performed by a qualified individual, including whether the child has any physical and/or mental disabilities sufficient to be categorized as a child with

disabilities under the ADA and that the child be reevaluated as the child's needs and the information available to Defendants change;

f)    Require that Defendants ensure that all children who enter foster care placement receive within 60 days of entering care an adequate and individualized written case plan for treatment, services, and supports to address the child's identified needs; describing a plan for reunification with the child's parents, for adoption, or for another permanent, family-like setting; describing any interim placements appropriate for the child while the child moves toward a permanent home-like setting; and describing the steps needed to keep the child safe during the child's time in Defendants' custody;

g)    Require that Defendants ensure that all children whose case plan identifies a need for services and/or treatment timely receive those services and/or treatment;

h)    Require Defendants to file and proceed with a timely petition to free a child for adoption when the child's permanency plan is adoption, unless the child's case plan documents show that doing so is not in the child's best interest or that the child has a statutory exemption from this requirement;

i)    Require Defendants to take all necessary steps to seek and secure an appropriate adoptive placement for a child when the child's permanency plan goal is adoption;

j)    Require that Defendants, when a child turns 14 years old while in its custody and is unlikely to be reunified with family, adopted, or otherwise placed in a permanent family-like setting, engage in transition planning to meet the healthcare, educational, employment, housing, and other social needs of the child in transitioning to adulthood;

k)    Require Defendants to provide all necessary services to each child who enters foster care, including necessary services to the child's parents to ensure a speedy reunification for as long as the child's permanency plan remains reunification;

l)    Require that Defendants ensure that all children with physical, mental, intellectual, or cognitive disabilities receive foster care services in the most integrated setting appropriate to the child's needs, including, in as many instances as is required by reasonable professional standards, family foster homes with supportive services;

m) Require that Defendants ensure that an adequate array of community-based therapeutic services are available to children with disabilities;

n) Require that Defendants ensure that they develop an adequate array of community-based therapeutic foster homes and therapeutic placements to meet the needs of children with disabilities; and

o) Require that Defendants conduct annual case record reviews of a statistically significant sample of children in Defendants' custody to measure how likely children in Defendants' custody are to receive timely permanence, as required by state and federal law, how often they are maltreated in care; and how well placement stability is maintained for these children;

p) Require that Defendants take all reasonable steps to ensure that maltreatment in care is reduced to at least national averages;

q) Require that timely permanence is brought into line with national averages; and

r) Require that placement stability is consistent with national averages.

5. Award Plaintiffs the reasonable costs and expenses incurred to litigate this action, including reasonable attorneys' fees, under 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and the Federal Rules of Civil Procedure 23(e) and (h);

6. Grant such other equitable relief as the Court deems just, necessary and proper to protect Plaintiffs from further harm while in foster care in DCFS's custody.

Dated:  April 10, 2024.

Respectfully submitted,
*s/ Robert L. Redfearn, Jr.*_____
Robert L. Redfearn, Jr. (LBSA No. 17106)
Windsor V. Richmond (LSBA No. 36645)
Kelly A. Gismondi (LSBA No. 39193)
Simon, Peragine, Smith & Redfearn, LLP
1100 Poydras St., Suite 3000
New Orleans, LA 70163
Telephone: (504)569-2996
Email: robertjr@spsr-law.com
        windsorr@spsr-law.com
        kellyg@spsr-law.com

Galen D. Bellamy (*PHV motion to be filed*)
Allison R. McLaughlin (*PHV motion to be filed*)
Kevin D. Homiak (*PHV motion to be filed*)
Emily Linehan (*PHV motion to be filed*)
Iva Velickovic (*PHV motion to be filed*)
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone:   (303) 244-1800
Facsimile:   (303) 244-1879
Email:   bellamy@wtotrial.com
          mclaughlin@wtotrial.com
          homiak@wtotrial.com
          linehan@wtotrial.com
          velickovic@wtotrial.com

Marcia Robinson Lowry (*PHV motion to be filed*)
Julia Tebor (*PHV motion to be filed*)
Lindsay Gus (*PHV motion to be filed*)
David Baloche (*PHV motion to be filed*)
A BETTER CHILDHOOD
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456
Facsimile: (212) 692-0415
Email: mlowry@abetterchildhood.org
          jtebor@abetterchildhood.org
          lgus@abetterchildhood.org
          dbaloche@abetterchildhood.org

*Attorneys for Plaintiffs*